[No. S128429. July 27, 2006.]

MICHAEL FLATLEY, Plaintiff and Respondent, v.
D. DEAN MAURO, Defendant and Appellant.

**COUNSEL**

Sedgwick, Detert, Moran & Arnold, James J. S. Holmes, Christina J. Imre, Douglas J. Collodel, Orly Degani and Wendy L. Wilcox for Defendant and Appellant.

Greenberg Glusker Fields Claman Machtinger & Kinsella, Bertram Fields and Ricardo P. Cestero for Plaintiff and Respondent.

Levy, Ram & Olson, Karl Olson, Erica L. Craven; Thomas W. Newton; Karlene W. Goller; Harold W. Fuson, Jr.; Stephen J. Burns; Levine Sullivan Koch & Schulz and James E. Grossberg for California Newspaper Publishers Association, Los Angeles Times, The Copley Press, Inc., McClatchy Newspapers, Inc., and the Orange County Register as Amici Curiae.

Bill Lockyer, Attorney General, Tom Greene, Chief Assistant Attorney General, Theodora Berger, Assistant Attorney General, Richard M. Frank, Edward G. Weil and Susan S. Fiering, Deputy Attorneys General, as Amici Curiae.

## OPINION

**MORENO, J.**—Plaintiff Michael Flatley, a well-known entertainer, sued defendant D. Dean Mauro, an attorney, for civil extortion, intentional infliction of emotional distress and wrongful interference with economic advantage. Flatley's action was based on a demand letter Mauro sent to Flatley on behalf of Tyna Marie Robertson, a woman who claimed that Flatley had raped her, and on subsequent telephone calls Mauro made to Flatley's attorneys, demanding a seven-figure payment to settle Robertson's claims. Mauro filed a motion to strike Flatley's complaint under the anti-SLAPP statute.[1] (Code Civ. Proc., § 425.16.) He argued that the letter was a prelitigation settlement offer and therefore Flatley's complaint arose from Mauro's exercise of his constitutionally protected right of petition. The trial court denied the motion. The Court of Appeal held that, because Mauro's letter and subsequent telephone calls constituted criminal extortion as a matter of law, and extortionate speech is not constitutionally protected, the anti-SLAPP statute did not apply. Therefore, it affirmed denial of Mauro's motion to strike. We granted Mauro's petition for review.

We conclude that, consistent with the legislative intent underlying the anti-SLAPP statute as revealed by the statutory language, and consistent with our existing anti-SLAPP jurisprudence, a defendant whose assertedly protected speech or petitioning activity was illegal as a matter of law, and therefore unprotected by constitutional guarantees of free speech and petition, cannot use the anti-SLAPP statute to strike the plaintiff's complaint. Applying this principle in the specific circumstances of the case before us, we agree with the Court of Appeal's conclusion. Mauro's communications constituted criminal extortion as a matter of law and, as such, were unprotected by constitutional guarantees of free speech or petition. Therefore, the anti-SLAPP statute does not apply. Accordingly, we affirm the decision of the Court of Appeal.

## I. FACTS AND PROCEDURAL HISTORY

Michael Flatley is a performer and dance impresario who owns "the stock of corporations that present live performances by Irish dance troupes throughout the world." On March 4, 2003, Tyna Marie Robertson sued Flatley in Illinois for battery and intentional infliction of emotional distress based on allegations that Flatley had raped her in his hotel suite in Las Vegas on the night of October 19-20, 2002. Robertson was represented by D. Dean Mauro,

---

[1] "SLAPP is an acronym for 'strategic lawsuit against public participation.'" (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 732, fn. 1 [3 Cal.Rptr.3d 636, 74 P.3d 737].) All further unspecified statutory references are to the Code of Civil Procedure.

an Illinois attorney. Robertson and Mauro then appeared on television, where Robertson described the alleged rape "in extremely lurid detail."[2]

On March 6, 2003, Flatley filed his complaint in the present action in California against Mauro, Robertson and Doe defendants.[3] In a second amended complaint, Flatley alleged five causes of action for civil extortion, defamation, fraud, intentional infliction of emotional distress, and wrongful interference with prospective economic advantage. The civil extortion, intentional infliction of emotional distress and wrongful interference causes of action were alleged against all defendants; the defamation and fraud causes of action were alleged against Robertson alone.

Mauro answered with a general denial and asserted various affirmative defenses including that Flatley's claims were barred by section 425.16, the anti-SLAPP statute. On August 1, 2003, Mauro filed a motion to strike Flatley's complaint under that statute.

Flatley's opposition to the motion argued that Mauro's communications constituted criminal extortion and were therefore not protected by the anti-SLAPP statute. He argued further that he could demonstrate a probability of prevailing on the merits. In support of his opposition, Flatley filed several declarations, including his own and those of his personal secretary, Thomas Trautmann, and his attorneys, John Brandon, Bertram Fields, and Richard Cestero.[4]

---

[2] Flatley requests that we take judicial notice that Robertson voluntarily dismissed this action and that a subsequent action Robertson brought against Flatley was also dismissed. (Evid. Code, §§ 452, subd. (c), 459.) While it is true, as Mauro maintains, that these dismissals were not before the trial court when it ruled on his motion to strike, nonetheless the documents are proper subjects for judicial notice and help complete the context of this case. Therefore, we grant Flatley's request. Both the Attorney General and Flatley have asked us to take judicial notice of portions of the legislative history of Code of Civil Procedure section 425.16. Flatley's request is in support of his claim that the statute only protects the valid exercise of constitutionally protected speech and petition rights. The Attorney General's request is in connection with his response to an argument made by Mauro that all litigation-related communication is protected under the statute, even if illegal. (See *post*, at pp. 320–325.) Mauro objects on the grounds that the statute speaks for itself and recourse to legislative history is unnecessary. While we have in the past made the same observation regarding the plain language of the statute, and we reach our conclusions in this case based on the statute's plain language, we have nonetheless granted similar requests to take judicial notice of section 425.16's legislative history in past cases. (See, e.g., *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120 [81 Cal.Rptr.2d 471, 969 P.2d 564].) Accordingly, we grant the requests.

[3] Robertson is not a party to this appeal.

[4] The only declaration Mauro submitted in support of his motion to strike Flatley's complaint was his own. His declaration acknowledged that he had mailed the January 2, 2003 letter and attachments to Flatley described above. The balance of his declaration recounted having received letters from Fields seeking an extension of time to respond to that letter and

The declarations submitted by Flatley set forth the following scenario:

Flatley met Robertson in Las Vegas sometime before October 2002. Robertson was very friendly and Flatley gave her the telephone number of his personal secretary, Thomas Trautmann (Trautmann) in the event she wanted to reach Flatley.

In October 2002, Robertson called Trautmann to arrange a rendezvous with Flatley. On October 19, 2002, Robertson arrived at Flatley's two-bedroom suite in the Venetian Hotel in Las Vegas. She was told that one room was for Flatley and the other was for Trautmann. Robertson put her belongings in Flatley's bedroom. She did not request alternate accommodations or protest the accommodations offered.

That evening, Flatley and Robertson had dinner together. Upon returning to Flatley's hotel room, Robertson excused herself to the bathroom. Flatley disrobed and got into bed. Robertson reappeared, nude, and entered Flatley's bed, where she remained for the night. According to Flatley, everything that transpired between him and Robertson that night was consensual. At no time did Trautmann, who was in the next room with the door open, hear any cry or complaint of any kind.

The next morning, Robertson entered the common area of the suite, and kissed Flatley in Trautmann's presence. Her demeanor was relaxed and happy. She ate breakfast with Flatley, speaking affectionately to him and cordially to Trautmann. Upon leaving, she kissed Flatley again and said she hoped to see him again.

On January 2, 2003, Mauro sent a letter addressed to Flatley that was received by Flatley's attorney, John Brandon. The letter emphasized certain text, using various font sizes, boldface type, capital letters, underlining, and italics.[5] In small print, it stated: "This communication is governed by all applicable common law decisions of the State of Illinois and Rule 408 of the U.S. Federal Rules of Evidence. All information contained herein is for settlement purposes only." The subject line stated in all-capital, boldface, underlined type: "**<u>LAWSUIT AGAINST MICHAEL FLATLEY, INDI-VIDUALLY, AND UNICORN ENTERTAINMENT, INC., AND THE</u>**

his reply. Finally, Mauro stated that "since a settlement could not be reached" he filed Robertson's suit. In his reply to Flatley's opposition to the motion to strike, Mauro objected to portions of the declarations submitted by Flatley. The trial court did not rule on those objections nor does the record reveal that Mauro pressed for a ruling. His objections are therefore deemed forfeited and we consider Flatley's declarations in their entirety. (*Gallant v. City of Carson* (2005) 128 Cal.App.4th 705, 710 [27 Cal.Rptr.3d 318]; *Slauson Partnership v. Ochoa* (2003) 112 Cal.App.4th 1005, 1014, fn. 4 [5 Cal.Rptr.3d 668].)

[5] The letter is reproduced in its entirety as appendix A.

**VENETION** [*sic*] **RESORT-HOTEL-CASINO VENTURE GROUP[.]**" Mauro identified his client as "Jane Doe" and referred to a report on file with the Las Vegas Police Department. The next line stated "Date of Rape/Sex Assault: **October 19–20, 2002.**"

The letter was addressed: "DEAR FLATLEY, *et. al.*: [*sic*] [¶] Please be advised that we represent a women [*sic*] with whom you engaged in forcible sexual assault on or about October 19-20, 2003 [*sic*: 2002]. Please consider this our *first,* and *only,* attempt to amicably resolve this claim against all Defendants named in the Complaint at Law enclosed herein."

On the second page, a large caption announced "**NOTICE OF CLAIM & ATTORNEY'S LIEN**". The letter continued: "Please consider this as Notice of our Attorneys' [*sic*] Liens. We hereby make a claim and lien in the amount of 40% of the Total Recovery of all funds obtained through trial or settlement, plus all costs of suit, and attorney fees leveled against you." After urging Flatley to contact his insurance carrier, the letter states "Tell them to contact me directly." It warns that Flatley's failure to do so will result in the filing of a lawsuit and that "all judgment proceeds" will be sought "*directly from your personal assets.*" The letter then states: "**You are granted until January 30, 2002,** [*sic*: 2003] **to resolve this matter.** The amounts claimed in the lawsuit are *naturally negotiable prior to suit.*" The letter warns, however, that if Flatley fails to meet the January 30 deadline "all offers to compromise, settle and amicably resolve this case will be **automatically withdrawn.**" The letter then goes on to "advise[]" Flatley that Mauro has retained "several forensic expert witnesses" whose opinions "shall be disclosed in detail in the public filed court documents in this litigation." Mauro also advises Flatley that he has "worked at Lloyd's of London, and [is] familiar with International Law. These causes of action allow for PUNITIVE DAMAGES. Punitive Damages are non-dischargeable in bankruptcy, and are recognized under British Law. We can therefore execute and collect any award against **MICHAEL FLATLEY** *personally* in the U.S., or the U.K.*" Next, Mauro refers to his expert "**Economist Frank Maguire**" who will testify "as to the amount of punitive damages which the law recognizes to justify 'sending a message' or what constitutes a 'deterrent.' "

The first paragraph of the third page of Mauro's letter refers Flatley to a "settlement of **$100,000,000.00**" awarded as punitive damages in an unidentified case. The second full paragraph then states that an investigation into Flatley's assets for purposes of determining an appropriate award of punitive damages, will require "an in-depth investigation" and that any information would then "**BECOME A MATTER OF PUBLIC RECORD, AS IT MUST BE FILED WITH THE COURT,** as it will be part of the bases of several of our expert's [*sic*] testimony." The third paragraph states in its entirety: "**Any**

and all information, including Immigration, Social Security Issuances and Use, and IRS and various State Tax Levies and information will be exposed. We are positive the media worldwide will enjoy what they find." After a paragraph describing the potential testimony of two other experts, John Lombardi and David K. Hirshey, apparently with respect to the failure of the Las Vegas hotel in which the alleged rape occurred to "provide requisite safeguards for our client," the fifth paragraph again warns that "**all pertinent information and documentation, if in violation of any U.S. Federal, Immigration, I.R.S., S.S. Admin., U.S. State, Local, Commonwealth U.K., or International Laws, shall immediately [be] turned over to any and all appropriate authorities.**" The final paragraph warns that once the lawsuit is filed additional causes of action "shall arise" including "Defamatory comments, Civil Conspiracy, Reckless Supervision" which are "just the beginning" and that "ample evidence" exists "to prove each and every element for all these additional causes of action. Again, these actions allow for **Punitive Damages.**"

At the top of the final page of the letter is the caption: "**FIRST & FINAL TIME-LIMIT SETTLEMENT DEMAND**." Beneath it a paragraph warns that there shall be "**no continuances nor any delays.** If we do not hear from you, then we shall know you are not interested in amicably resolving this claim and we shall immediately file suit." At the bottom of the page, beneath Mauro's signature, a final paragraph warns Flatley that, along with the filing of suit, press releases will be disseminated to various media sources, including but not limited to "**Fox News Chicago, Fox News Indiana, Fox News Wisconsin, and the U.S. National Fox News Network; WGN National U.S. Television; All Local Las Vegas Television, radio stations and newspapers; The Chicago Tribune, The Chicago Southern Economist, The News Sun, The Beacon News, The Daily Herald, The New York Times, The Washington Post; ALL National U.S. Television Networks of NBC, ABC and CBS; as well as INTERNET POSTINGS WORLDWIDE, including the BRITISH BROADCASTING COMPANY, and the Germany National News Network Stations.**"

Attached to the letter were 51 pages of material, including a draft of Robertson's complaint against Flatley, Robertson's medical records pertaining to treatment for the alleged rape, certificates of achievement awarded to Mauro, newspaper articles chronicling Mauro's multimillion-dollar cases and settlements, and the curricula vitae of Mauro's experts.

Among the attachments was a letter Robertson wrote to the Las Vegas Police Department on November 17, 2002. The letter refers to a telephone call she had made to the police department on November 14 in which she reported the rape. She asked that the letter, which described the rape, be

added to the earlier report because she "did not get an adequate opportunity to explain." She added, however, that she had no "interest in seeing the Initial Incident Complaint form," because she was "a private person, and this is not something about which I can openly or freely explain to people." She also wrote that she could not at that time go into "more specific, or graphic details" because she was not "in any condition to relive this."

The record does not show that Robertson provided any additional information to the police, or that the police took any action regarding her allegation. According to Flatley's and Trautmann's declarations, no one in the Las Vegas Police Department contacted either Flatley or his representatives about the allegation and Flatley remained unaware of the allegation until Brandon received Mauro's letter.

Upon receipt of Mauro's letter, Brandon immediately called Mauro. Mauro gave Brandon a deadline of January 30, 2003, "to offer sufficient payment." On January 9, 2003, Mauro telephoned Brandon to complain that he had not heard from Flatley or Flatley's representatives. Brandon explained that he was not handling the matter but offered to pass along any message. Mauro told him that he would not extend the January 30, 2003 deadline. He added: "I know the tour dates; I am not kidding about this; it will be publicized every place he [Flatley] goes for the rest of his life." He added that dissemination of the story "would be immediate to any place where he [Flatley] and the troupes are performing everywhere in the world."

On January 10, 2003, Mauro again called Brandon, who was in a meeting, and left a message with Brandon's secretary. The message read: "Dean Mauro needs a call back in one-half hour, otherwise they are going public." When Brandon returned Mauro's call, Mauro "complained that people were investigating the matter before contacting him and were doing so in an intimidating manner. He said that if he did not receive a call by 8 p.m. Central Standard Time . . . , he would 'go public and the January 30 deadline is gone.' " He said, "I already have the news media lined up" and would "hit him [Flatley] at every single place he tours." Brandon read this back to Mauro to confirm its accuracy. When Brandon asked Mauro why he was concerned about Flatley's attorneys investigating Robertson's claim before making an offer, Mauro stated that this "case is like an insurance claim where the adjuster would call the lawyer to acknowledge the attorney's lien." Brandon asked Mauro if acknowledging the lien was a problem. Mauro said "never mind about that, just pass on the message." Brandon conveyed the message to Bertram Fields, the attorney handling the matter for Flatley.

Fields called Mauro later that day. Mauro told Fields he knew how to "play hardball" and that if Flatley did not pay an acceptable amount, he and Robertson would "go public." Mauro said he would ensure that the story would follow Flatley wherever he or his troupes performed and would "ruin" him. Fields asked Mauro how much he was demanding and Mauro replied "it would take seven figures."

Fields reported Mauro's conduct to the FBI and arranged for Flatley to give the FBI a voluntary interview without the presence of counsel. Hoping to allow the FBI more time to investigate, Fields wrote Mauro asking him to extend the deadline. Mauro extended the deadline by one day in a letter that complained that Fields had failed to return Mauro's numerous messages. "You have my personal cell phone number, on 24 hours daily, and we still have received no substantive conversation of any kind for nearly a month."

Flatley did not pay Robertson and Mauro.

Mauro's reply to Flatley's opposition to the motion to strike argued that his January 2, 2002 letter was a prelitigation settlement offer in furtherance of his constitutional right of petition and, therefore, protected by section 425.16, subdivision (e)(1) and (4). He argued further that Flatley had failed to demonstrate a probability of prevailing on any of his causes of action.

On September 22, 2003, the trial court denied Mauro's motion to strike. It found that Mauro had not satisfied his initial burden to show that his communication was protected by section 425.16. Mauro appealed (§ 904.1, subd. (a)(13)), and the Court of Appeal affirmed, holding that, as a matter of law, Mauro's communications constituted criminal extortion and therefore were not protected under section 425.16. The Court of Appeal did not address whether Flatley had demonstrated a probability of prevailing on the merits. We granted Mauro's petition for review.[6]

## II. DISCUSSION

A. *The Anti-SLAPP Statute Does Not Apply to Speech and Petitioning Activity That Is Illegal as a Matter of Law and, Therefore, Not Constitutionally Protected.*

1. *General Principles Regarding Section 425.16*

■ The anti-SLAPP statute, section 425.16, allows a court to strike any cause of action that arises from the defendant's exercise of his or her

---

[6] Mauro is no longer licensed to practice law in Illinois, having voluntarily retired in 2005, according to the Illinois State Bar Web site. He has no public record of discipline. (<http://www.iardc.org> [as of July 27, 2006].)

constitutionally protected rights of free speech or petition for redress of grievances. (§ 425.16, subd. (b)(1).) We described the purpose of the statute, and the process by which a motion to strike is determined, in the companion case, *Soukup v. Hafif* (2006) 39 Cal.4th 260 [46 Cal.Rptr.3d 638, 139 P.3d 30], where we said: " 'The Legislature enacted section 425.16 to prevent and deter "lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Because these meritless lawsuits seek to deplete "the defendant's energy" and drain "his or her resources" [citation], the Legislature sought " 'to prevent SLAPPs by ending them early and without great cost to the SLAPP target.' " [Citation.] ▊ Section 425.16 therefore establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary-judgment-like procedure at an early stage of the litigation.' (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 192 [25 Cal.Rptr.3d 298, 106 P.3d 958]; see *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 737 [section 425.16 'is a procedural device for screening out meritless claims'].) [¶] . . . [¶] The Legislature's purpose in enacting the anti-SLAPP statute is set forth in its findings and declarations. 'The Legislature finds and declares that it is in the public interest to encourage participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process.' (§ 425.16, subd. (a).) ▊ Furthermore, to accomplish this purpose the Legislature has directed that the statute 'be construed broadly.' (*Ibid.*) To this end, when construing the anti-SLAPP statute, '[w]here possible "we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . . ." [Citation.]' (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 733, quoting *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632 [59 Cal.Rptr.2d 671, 927 P.2d 1175].)" (*Id.* at pp. 278–279.)

Our concern for effectuating the legislative intent as demonstrated by the plain language of the statute has led us to reject attempts to read into section 425.16 requirements not explicitly contained in that language. (See, e.g., *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th 728, 735 [no categorical exemption for malicious prosecution actions under section 425.16 where the Legislature had not created such an exemption]; *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 74–76 [124 Cal.Rptr.2d 519, 52 P.3d 695] [declining to read into section 426.16 a requirement that a defendant demonstrate that the plaintiff's action actually intended to chill the defendant's exercise of his or her protected rights]; *Briggs v. Eden Council, supra,* 19 Cal.4th at pp. 1113–1117 [section 425.16, subdivision (e)(1) and (2) does not require that statements made before, or in connection with an issue pending before an official proceeding, also involve an issue of public significance absent statutory language to that effect].) In short, our anti-SLAPP jurisprudence has

attempted to effectuate the central purpose of the statute by carefully examining the actual words of the statute and giving them their plain meaning.

■ As noted, the purpose of section 425.16 is to prevent the chilling of "the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" by the "abuse of the judicial process." (§ 425.16, subd. (a).) As a necessary corollary to this statement, because not all speech or petition activity is constitutionally protected, not all speech or petition activity is protected by section 425.16. (See, e.g., *Lam v. Ngo* (2001) 91 Cal.App.4th 832, 851 [111 Cal.Rptr.2d 582] [violence and other criminal acts are not protected by the First Amendment even if committed out of political motives at a political demonstration; nor would Doe defendants who engaged in such activity be protected by the anti-SLAPP statute].) The "scope of [section 425.16] is not without limits, as demonstrated in . . . cases finding lawsuits were not within its protection. [Citations.]" (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 864 [117 Cal.Rptr.2d 82].) The case most often cited in support of this proposition is *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 [102 Cal.Rptr.2d 864] (*Paul*), disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, footnote 5 [124 Cal.Rptr.2d 507, 52 P.3d 685]. Flatley argues, and the Court of Appeal agreed, that *Paul* is dispositive of the issues raised in this case, so we examine it in some detail.

### 2. Paul

In *Paul*, the plaintiff was a city council member seeking reelection. Following his defeat, he filed an action against several individuals, alleging that they "interfered with plaintiff's candidacy by influencing the election with illegal campaign contributions for one of his opponents. Plaintiff alleged that defendants' acts violated the Political Reform Act of 1974. (Gov. Code, § 81000 et seq. (the Political Reform Act).)" (*Paul, supra,* 85 Cal. App.4th at p. 1361, italics omitted.) The defendants "moved to strike the complaint" as a SLAPP but "[t]heir moving papers . . . show[ed] that they in fact did violate the Political Reform Act when they laundered campaign contributions to persons running for local or state offices." (*Ibid.*) Nonetheless, the "defendants argued that their money laundering was 'in furtherance of [their] constitutional rights of free speech' and '[arose] out of acts in furtherance of [their] constitutionally protected conduct.'" (*Id.* at pp. 1361–1362.) The plaintiff argued in his opposition that "section 425.16 [did] not apply in this case because defendants' actions in laundering campaign money do not constitute constitutionally protected activity." (*Id.* at p. 1362.)

■ The Court of Appeal agreed with the plaintiff. After quoting the language of section 425.16, subdivision (a) on the purpose of the statute, the court discussed the respective burdens the statute places on the parties upon the filing of a motion to strike. "First, the court decides whether the defendant has made a threshold prima facie showing that the defendant's acts, of which the plaintiff complains, were ones taken in furtherance of the defendant's constitutional rights of petition or free speech in connection with a public issue. [Citation.] If the court finds that such a showing has been made, then the plaintiff will be required to demonstrate that 'there is a probability that the plaintiff will prevail on the claim.' [Citations.] The defendant has the burden on the first issue, the threshold issue; the plaintiff has the burden on the second issue." (*Paul, supra,* 85 Cal. App.4th at p. 1364, fn. omitted.)

The court held that to meet its burden "the defendant does not have to '*establish* its actions are constitutionally protected under the First Amendment as a matter of law. If this were so the second clause of subdivision (b) of section 425.16 would be superfluous because by definition the plaintiff could not prevail on its claim.' [Citation.] Rather, the defendant must present a prima facie showing that the plaintiff's causes of action arise from acts of the defendant taken to further the defendant's rights of free speech or petition in connection with a public issue. [Citation.] Only if the defendant makes this prima facie showing does the trial court consider the second step of the section 425.16, subdivision (b)(1) analysis; at that point the burden shifts to the plaintiff to make a prima facie showing of facts which, if proven at trial, would support a judgment in the plaintiff's favor." (*Paul, supra,* 85 Cal.App.4th at p. 1365.)

Applying the statutory procedure thus described to the case before it, the *Paul* court held that "we need not address the second step of section 425.16's two-step motion to strike process because we hold, *as a matter of law,* that defendants cannot meet their burden on the first step. . . . [T]he activity of which plaintiff complains—defendants' campaign money laundering—was not a *valid* activity undertaken by defendants in furtherance of their constitutional right of free speech. This conclusion is established by the factual record before us and is not really disputed by the defendants. Indeed, defendants argue that they are entitled to the benefit of section 425.16 in spite of such illegality." (*Paul, supra,* 85 Cal.App.4th at p. 1365.)

*Paul* acknowledged that the "making of a political campaign contribution is a type of political speech." (*Paul, supra,* 85 Cal.App.4th at p. 1365.) Nonetheless it rejected the defendants' claim that, because their money laundering activity was taken "in furtherance of their constitutional right of free speech," the activity fell within the ambit of the anti-SLAPP statute even though illegal. (*Ibid.*) "[T]he probability that the Legislature intended to give

defendants section 425.16 protection from a lawsuit based on injuries they are alleged to have caused by their *illegal* campaign money laundering scheme is as unlikely as the probability that such protection would exist for them if they injured plaintiff while robbing a bank to obtain money for the campaign contributions or while hijacking a car to drive the campaign contributions to the post office for mailing. . . . Thus, while it is technically true that laundering campaign contributions is an act in furtherance of the giving of such contributions, that is, is in furtherance of an act of free speech, we reject the notion that section 425.16 exists to protect such illegal activity." (*Id.* at p. 1366.)

In support of its conclusion, *Paul* cited *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809 [33 Cal.Rptr.2d 446], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at page 68, footnote 5, which distinguished between activity that would be protected under the statute and activity that would not. "Thus, if the defendant's act was a lawsuit against a developer the defendant would have a prima facie First Amendment defense. [Citation.] But, if the defendant's act was burning down the developer's office as a political protest the defendant's motion to strike could be summarily denied without putting the developer to the burden of establishing the probability of success on the merits in a tort suit against defendant." (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 820.) The *Paul* court commented: "While laundering campaign money may not be as dramatic or physically dangerous as burning down a building, it is equally outside the scope of section 425.16's protection." (*Paul, supra,* 85 Cal.App.4th at p. 1367.)

*Paul* emphasized the narrow circumstance in which a defendant's assertedly protected activity could be found to be illegal as a matter of law and therefore not within the purview of section 425.16. "This case . . . involves a factual context in which defendants have effectively conceded the illegal nature of their election campaign finance activities for which they claim constitutional protection. Thus, there was no dispute on that point and we have concluded, as a matter of law, that such activities are *not* a valid exercise of constitutional rights as contemplated by section 425.16. However, had there been a factual dispute as to the legality of defendants' actions, then we could not so easily have disposed of defendants' motion." (*Paul, supra,* 85 Cal.App.4th at p. 1367.) The court explained that, if the plaintiff contested the validity of the defendant's exercise of protected rights "and unlike the case here, cannot demonstrate as a matter of law that the defendant's acts do not fall under section 425.16's protection, then the claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's burden to provide a prima facie showing of the merits of the plaintiff's case." (*Ibid.*)

■ In *Paul*, then, the court discerned that section 425.16, by its express terms, does not apply to any activity that can conceivably be characterized as being " 'in furtherance' " of a defendant's protected speech or petition rights if, as a matter of law, that activity was illegal and by reason of the illegality not constitutionally protected. (*Paul, supra,* 85 Cal.App.4th at p. 1367.) In such a narrow circumstance, where either the defendant concedes the illegality of its conduct or the illegality is conclusively shown by the evidence, the motion must be denied. The rationale is that the defendant cannot make a threshold showing that the illegal conduct falls within the purview of the statute and promotes section 425.16's purpose to "prevent and deter 'lawsuits [referred to as SLAPP's] brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.' (§ 425.16, subd. (a).)" (*Varian Medical Systems, Inc. v. Delfino, supra,* 35 Cal.4th at p. 192.) If, however, a factual dispute exists about the legitimacy of the defendant's conduct, it cannot be resolved within the first step but must be raised by the plaintiff in connection with the plaintiff's burden to show a probability of prevailing on the merits.

*Paul*'s interpretation of section 425.16 has been unanimously accepted in the Court of Appeal. (See, e.g., *City of Los Angeles v. Animal Defense League* (2006) 135 Cal.App.4th 606, 621 [37 Cal.Rptr.3d 632] ["[I]f the defendant concedes the conduct complained of was illegal, the defendant will be unable to make a prima facie showing the action arises from protected activity within the meaning of section 425.16"]; *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty U.S.A., Inc.* (2005) 129 Cal.App.4th 1228, 1246 [29 Cal.Rptr.3d 521] ["If the defendant *concedes* or the evidence *conclusively establishes* the conduct complained of was illegal, as a matter of law the defendant cannot make a prima facie showing the action arises from protected activity within the meaning of section 425.16"]; *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568, 584 [132 Cal.Rptr.2d 789] [Noting *Paul* "explicitly recognized that the validity of defendant's act comes into play in the second stage of the statutory analysis. [Citation.] It held, however, that the defendants, having admitted engaging in *illegal* campaign contributions (the subject of the suit), had established that their acts had not been in furtherance of their constitutional rights"]; *Yu v. Signet Bank/Virginia* (2002) 103 Cal.App.4th 298, 317, fn. 3 [126 Cal.Rptr.2d 516] ["It is not argued that the illegality of Banks' petitioning activity has been effectively conceded, or conclusively established by the evidence"]; *Governor Gray Davis Com. v. American Taxpayers Alliance* (2002) 102 Cal.App.4th 449, 459 [125 Cal.Rptr.2d 534] ["Here, in contrast [to *Paul*], appellant neither has conceded nor does the evidence conclusively establish the illegality of its communications made during the course of debate on political issues"]; *Chavez v. Mendoza* (2001) 94 Cal.App.4th 1083, 1090 [114 Cal.Rptr.2d 825] ["A limited exception to the rule precluding a court from determining the validity

of the asserted constitutional right in the first step of the anti-SLAPP analysis applies only where the defendant indisputably concedes the claim arose from illegal or constitutionally unprotected activity"].)

*Paul* also finds support in our decision in the companion case of *Soukup v. Hafif*, which examines section 425.18. Section 425.18 exempts from the anti-SLAPP statute " 'SLAPPback[s]' . . . any cause of action for malicious prosecution or abuse of process arising from the filing or maintenance of a prior cause of action that has been dismissed pursuant to a special motion to strike under section 425.16" (§ 425.18, subd. (b)(1))—if the underlying action was "illegal as a matter of law." (§ 425.18, subd. (h).) By enacting section 425.18, the Legislature signaled its agreement with the interpretation of the scope of section 425.16 advanced by *Paul*. "In adding this proviso, the Legislature appears to have had in mind decisions by the Court of Appeal that have held that the anti-SLAPP statute is not available to a defendant who claims that the plaintiff's cause of action arises from assertedly protected activity when that activity is illegal as a matter of law and, for that reason, not protected by the First Amendment. (See, e.g., *Paul*[, *supra*,] 85 Cal.App.4th 1356 [102 Cal.Rptr.2d 864], disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5." (*Soukup v. Hafif, supra,* 39 Cal.4th at p. 284.)[7]

We agree with *Paul* that section 425.16 cannot be invoked by a defendant whose assertedly protected activity is illegal as a matter of law and, for that reason, not protected by constitutional guarantees of free speech and petition. A contrary rule would be inconsistent with the purpose of the anti-SLAPP statute as revealed by its language. (*Paul, supra,* 85 Cal.App.4th at p. 1365 ["[T]he activity of which plaintiff complains . . . was not a *valid* activity undertaken by defendants in furtherance of their constitutional right [to] free speech"].) Moreover, it would eviscerate the first step of the two-step inquiry set forth in the statute if the defendant's mere assertion that his underlying activity was constitutionally protected sufficed to shift the burden to the plaintiff to establish a probability of prevailing where it could be conclusively shown that the defendant's underlying activity was illegal and not constitutionally protected. While a defendant need only make a prima facie showing that the underlying activity falls within the ambit of the statute, clearly the statute envisions that the courts do more than simply rubberstamp such assertions before moving on to the second step. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 819 ["[I]t is fundamentally fair that before putting the plaintiff to the burden of establishing probability of success on the merits the defendant be required to show imposing that burden is justified by the

---

[7] Section 425.18 does not apply in this case because Flatley's action does not fit the definition of a SLAPPback in that it is not an action for malicious prosecution or abuse of process and because Robertson's underlying action was not dismissed as a SLAPP.

nature of the plaintiff's complaint"].) Furthermore, as the Attorney General points out in his amicus curiae brief, "[i]f the courts rule that a defendant who has engaged in indisputably illegal behavior . . . has met the first step of the motion to strike, the defendant can then shift the burden to the plaintiff and force his victim to [marshal] and present evidence early in the litigation before the commencement of full discovery . . . . [I]f the plaintiff/victim is unable to show a probability of prevailing, he will have to pay the defendant's attorneys fees. (See § 425.16, subd. (c).) These are . . . grossly unfair burdens to impose on a plaintiff who is himself the victim of the defendant's criminal activity."

Citing *Navellier v. Sletten* (2002) 29 Cal.4th 82 [124 Cal.Rptr.2d 530, 52 P.3d 703] (*Navellier*), Mauro argues that any claimed illegitimacy of defendant's assertion of protected rights in a motion to strike under section 425.16 must be decided under the second step of the statutory inquiry, which requires plaintiffs to show their action has "minimal merit." (*Navellier*, at p. 89.) *Navellier*, however, is not dispositive of the issue before us.

In *Navellier*, the plaintiffs sued the defendant in federal court alleging breach of fiduciary duty in connection with the defendant's management of an investment company established by the plaintiffs. While the federal action was pending, the parties entered into an agreement that included a release of claims that the defendant signed. Subsequently, however, when the plaintiffs amended their complaint in the federal action, the defendant filed counterclaims. The plaintiffs obtained dismissal of two of the counterclaims based on the release. Ultimately, the federal action went to trial and resulted in a defense verdict. On appeal, the Ninth Circuit affirmed judgment for the defendant but also affirmed the dismissal of the defendant's counterclaims on the grounds they were barred by the release of claims. (*Navellier, supra,* 29 Cal.4th at pp. 86–87.)

While the federal appeal was pending, the plaintiffs filed a state action "alleging that [the defendant] had committed fraud in misrepresenting his intention to be bound by the Release, so as to induce plaintiffs to incur various litigation costs in the federal action that they would not have incurred had they known [the defendant's] true intentions. Plaintiffs also alleged that [the defendant] had committed breach of contract by filing counterclaims in the federal action." (*Navellier, supra,* 29 Cal.4th at p. 87.) The defendant filed a motion to strike the complaint as a SLAPP. The trial court denied the motion and the Court of Appeal affirmed. We reversed.

The principal issue in *Navellier* was whether the plaintiffs' causes of action for fraud and breach of contract arose from acts in furtherance of the defendant's exercise of protected speech or petition rights. We concluded that

they did. We observed that the fraud claim was based on the defendant's "negotiation, execution, and repudiation of the Release" which "limited the types of claims that [the defendant] was allowed to file in the federal action," and that the "plaintiffs relied on the Release" when they moved to dismiss the defendant's counterclaims. (*Navellier*, *supra*, 29 Cal.4th at p. 90.) Thus, the defendant's "negotiation and execution of the Release . . . involved 'statement[s] or writing[s] made in connection with an issue under consideration or review by a . . . judicial body' (§ 425.16, subd. (e)(2)), i.e., the federal district court, and his arguments respecting the Release's validity were 'statement[s] or writing[s] made before a . . . judicial proceeding' (*id.*, subd. (e)(1)), i.e., the federal action." (*Ibid.*) Similarly, we concluded that the plaintiffs' breach of contract cause of action involved activity protected by the anti-SLAPP statute because it was based on the defendant's filing of his counterclaims in the federal action. "A claim for relief filed in federal district court indisputably is a 'statement or writing made before a . . . judicial proceeding.' " (*Ibid.*)

Only at the end of our analysis did we address the plaintiffs' claim that "the anti-SLAPP statute does not apply to this action because any petitioning activity on which it was based was not 'valid.' " (*Navellier*, *supra*, 29 Cal.4th at p. 94.) The precise argument, as summarized in the dissent, was that "[t]he breach of contract claim is not a SLAPP because [the defendant] had exchanged his right to sue through the release for consideration, and thus his petitioning was not a 'valid exercise' of that right." (*Id.* at p. 97 (dis. opn. of Brown, J.).) The majority disagreed. "That the Legislature expressed a concern in the statute's preamble with lawsuits that chill the valid exercise of First Amendment rights does not mean that a court may read a separate proof-of-validity requirement into the operative sections of the statute. [Citations.] Rather, any 'claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.' (*Paul*[, *supra*,] 85 Cal.App.4th 1356, 1367, 102 Cal.Rptr.2d 864.)" (*Id.* at p. 94.) We concluded that a defendant is not required to establish that its actions are constitutionally protected as a matter of law because such a requirement would render the second prong of the anti-SLAPP statute " 'superfluous.' " (*Id.* at p. 95.)

*Navellier* did not consider whether or how the anti-SLAPP statute applies to a defendant whose assertedly protected activity is conclusively demonstrated to be illegal as a matter of law. *Navellier* was concerned with the threshold showing a defendant is required to make to come within the ambit of the anti-SLAPP statute where a dispute exists about whether the defendant's exercise of his or her constitutionally protected rights was valid. While we cited *Paul* with approval for its holding that, ordinarily, any claimed illegitimacy of the defendant's conduct must be resolved as part of a

plaintiff's secondary burden to show the action has "minimal merit," (*Navellier, supra*, 29 Cal.4th at p. 87), we expressed no opinion regarding *Paul*'s conclusion that the anti-SLAPP statute does not apply in those rare cases where the defendant's assertedly protected speech or petitioning activity is conclusively demonstrated to have been illegal as a matter of law.

■ "A decision, of course, does not stand for a proposition not considered by the court." (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 343 [14 Cal.Rptr.3d 857, 92 P.3d 350].) Accordingly, *Navellier*'s holding—that the anti-SLAPP statute does not require the defendants who bring motions to strike under section 425.16 to prove their asserted exercise of protected speech or petition rights was valid as a matter or law—is not dispositive of the question presented here of whether a defendant whose underlying conduct is conclusively demonstrated to have been illegal as a matter of law, and thus unprotected by the federal and state constitutional speech and petition guarantees, is foreclosed from invoking the anti-SLAPP statute in the first instance.

■ We conclude, therefore, that where a defendant brings a motion to strike under section 425.16 based on a claim that the plaintiff's action arises from activity by the defendant in furtherance of the defendant's exercise of protected speech or petition rights, but either the defendant concedes, or the evidence conclusively establishes, that the assertedly protected speech or petition activity was illegal as a matter of law, the defendant is precluded from using the anti-SLAPP statute to strike the plaintiff's action. In reaching this conclusion, we emphasize that the question of whether the defendant's underlying conduct was illegal as a matter of law is preliminary, and unrelated to the second prong question of whether the plaintiff has demonstrated a probability of prevailing, and the showing required to establish conduct illegal as a matter of law—either through defendant's concession or by uncontroverted and conclusive evidence—is not the same showing as the plaintiff's second prong showing of probability of prevailing. With this understanding, we turn to Mauro's claim that even conduct illegal as a matter of law is protected by the anti-SLAPP statute if it is protected by the litigation privilege. (Civ. Code, § 47, subd. (b).)

### 3. *The Litigation Privilege and Section 425.16*

Mauro argues: "All litigation-related speech, lawful or not, is in furtherance of petition or free speech rights." Thus, he argues, even assuming his letter was extortion, it is nonetheless protected by Code of Civil Procedure

section 425.16 because it falls within subdivision (e)(1) and (2).[8] In advancing this argument, he invokes the litigation privilege set forth in Civil Code section 47, subdivision (b). He argues, first, that section 425.16 protects litigation communication to the same degree that such communication is protected by the litigation privilege and then reasons from this premise that section 425.16 must also protect unlawful litigation-related communication because the litigation privilege does.[9] He claims *Paul* is inapplicable to this case because it did not involve litigation-related communications protected by section 425.16, subdivision (e)(1) or (2) but, rather, noncommunicative conduct protected by subdivision (e)(4).[10] We disagree.

"The principal purpose of [Civil Code] section [47, subdivision (b)] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 213 [266 Cal.Rptr. 638, 786 P.2d

---

[8] Section 425.16, subdivision (e) provides as follows: "(e) As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest."

[9] Civil Code section 47, subdivision (b) states in relevant part: "A privileged publication or broadcast is one made: [¶] . . . [¶] (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure . . . ."

[10] Mauro argues that *Paul* is inapplicable to this case because *Paul* involved activity that falls within section 425.16, subdivision (e)(4)—"any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest"—rather than subdivision (e)(1)—"any written or oral statement or writing made before a . . . judicial proceeding," under which Mauro purports to seek the shelter of the anti-SLAPP statute. As Flatley points out, Mauro's motion to strike was not based on subdivision (e)(2) but on an assertion that his "prelitigation communicative efforts to reach a settlement of his client's claims . . . are protected by section *425.16(e)(1) and (e)(4)*." Mauro may not change his theory of the case for the first time on appeal. (*Estate of Westerman* (1968) 68 Cal.2d 267, 278–279 [66 Cal.Rptr. 29, 437 P.2d 517].) Moreover, the premise of Mauro's argument—that all prelitigation communication is protected by subdivision (e)(2) even if it includes constitutionally unprotected speech, like extortionate speech, because the speech was uttered in the context of litigation conflates the litigation privilege with the anti-SLAPP statute in a manner we reject for the reasons set forth above. His argument is also profoundly inconsistent with the basic purpose of the anti-SLAPP statute to prevent the chilling of "the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances" "through abuse of the judicial process." (§ 425.16, subd. (a).)

365].) Additionally, the privilege promotes effective judicial proceedings by encouraging " 'open channels of communication and the presentation of evidence' " without the external threat of liability (*ibid.*), and "by encouraging attorneys to zealously protect their clients' interests." (*Id.* at p. 214.) "Finally, in immunizing participants from liability for torts arising from communications made during judicial proceedings, the law places upon litigants the burden of exposing during trial the bias of witnesses and the falsity of evidence, thereby enhancing the finality of judgments and avoiding an unending roundelay of litigation, an evil far worse than an occasional unfair result." (*Ibid.*)

▮ To accomplish these objectives, the privilege is "an 'absolute' privilege, and it bars all tort causes of action except a claim of malicious prosecution." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 360 [7 Cal.Rptr.3d 803, 81 P.3d 244].) The litigation privilege has been applied in "numerous cases" involving "fraudulent communication or perjured testimony." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 218; see, e.g., *Home Ins. Co. v. Zurich Ins. Co.* (2002) 96 Cal.App.4th 17, 20, 22–26 [116 Cal.Rptr.2d 583] [attorney's misrepresentation of available insurance policy limits to induce the settlement of a lawsuit]; *Doctors' Co. Ins. Services v. Superior Court* (1990) 225 Cal.App.3d 1284, 1300 [275 Cal.Rptr. 674] [subornation of perjury]; *Carden v. Getzoff* (1987) 190 Cal.App.3d 907, 915 [235 Cal.Rptr. 698] [perjury]; *Steiner v. Eikerling* (1986) 181 Cal.App.3d 639, 642–643 [226 Cal.Rptr. 694] [preparation of a forged will and presentation of it for probate]; *O'Neil v. Cunningham* (1981) 118 Cal.App.3d 466, 472–477 [173 Cal.Rptr. 422] [attorney's letter sent in the course of judicial proceedings allegedly defaming his client].) The privilege has also been held to apply to "statements made prior to the filing of a lawsuit." (*Hagberg v. California Federal Bank, supra,* 32 Cal.4th at p. 361.) Seizing upon these principles, Mauro maintains that section 425.16 similarly protects any prelitigation-related communication even if that communication constitutes extortion.[11]

▮ Assuming without deciding that the litigation privilege may apply to such threats, we conclude that they are nonetheless not protected under the anti-SLAPP statute because the litigation privilege and the anti-SLAPP statute are substantively different statutes that serve quite different purposes, and it is not consistent with the language or the purpose of the anti-SLAPP statute to protect such threats.

There is, of course, a relationship between the litigation privilege and the anti-SLAPP statute. Past decisions of this court and the Court of Appeal have

---

[11] Flatley asserts that, even if Mauro's communications could be deemed prelitigation communication, prelitigation conduct does not fall within the ambit of section 425.16. We have concluded otherwise. (*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1115 [" 'communications preparatory to or in anticipation of bringing an action or other official proceeding' " are protected by section 425.16].)

looked to the litigation privilege as an aid in construing the scope of section 425.16, subdivision (e)(1) and (2) with respect to the first step of the two-step anti-SLAPP inquiry—that is, by examining the scope of the litigation privilege to determine whether a given communication falls within the ambit of subdivision (e)(1) and (2).

For example, in *Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th 1106, we declined to read into section 425.16, subdivision (e)(1) and (2), which protects statements made before, or in connection with, an issue pending before an official proceeding, a further requirement that the statements concern an issue of public significance. In so holding, we observed that imposing a " 'public issue' requirement" as a condition to protecting litigation-related communications under the anti-SLAPP statute would produce an "anomalous result." (*Briggs v. Eden Council for Hope & Opportunity, supra,* 19 Cal.4th at p. 1121.) Litigation-related communications that did not involve a public issue would not be protected under the anti-SLAPP statute but would nonetheless be privileged under the litigation privilege, and protected by state and federal constitutional guarantees of the right of petition. (*Ibid.*) Thus, in *Briggs,* we bolstered our interpretation of the scope of the protection afforded to litigation-related communications under the anti-SLAPP statute by looking at whether our result was consistent with the scope of the protection afforded to such communications by the litigation privilege. Nowhere in *Briggs,* however, did we suggest, much less hold, that the scope of those protections is identical in every respect.

The litigation privilege is also relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing. (See, e.g., *Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 926–927 [120 Cal.Rptr.2d 576] [where the plaintiff's defamation action was barred by Civil Code section 47, subdivision (b), the plaintiff cannot demonstrate a probability of prevailing under the anti-SLAPP statute]; *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman* (1996) 47 Cal.App.4th 777, 783–785 [54 Cal.Rptr.2d 830] [the defendant's prelitigation communication was privileged and trial court therefore did not err in granting motion to strike under the anti-SLAPP statute].)

Notwithstanding this relationship between the litigation privilege and the anti-SLAPP statute, as we have observed, the two statutes are not substantively the same. In *Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th 728, we declined to create a categorical exemption from section 425.16 for malicious prosecution actions even though such claims are exempt from the litigation privilege. We rejected the plaintiff's "attempted analogy between the litigation privilege and the anti-SLAPP statute" as "inapt," explaining "the litigation privilege is an entirely different type of statute than section 425.16.

The former enshrines a substantive rule of law that grants absolute immunity from tort liability for communications made in relation to judicial proceedings [citation]; the latter is a procedural device for screening out meritless claims [citation]." (*Jarrow Formulas, Inc.*, at p. 737.)

Nor do the two statutes serve the same purposes. The litigation privilege embodied in Civil Code section 47, subdivision (b) serves broad goals of guaranteeing access to the judicial process, promoting the zealous representation by counsel of their clients, and reinforcing the traditional function of the trial as the engine for the determination of truth. Applying the litigation privilege to some forms of unlawful litigation-related activity may advance those broad goals notwithstanding the "occasional unfair result" in an individual case. (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 214; *Doctors' Co. Ins. Services v. Superior Court, supra,* 225 Cal.App.3d at p. 1300 [the litigation privilege applies to subornation of perjury because "it is in the nature of a statutory privilege that it must deny a civil recovery for immediate wrongs— sometimes even serious and troubling ones—in order to accomplish what the Legislature perceives as a greater good"].)

Section 425.16 is not concerned with securing for litigants freedom of access to the judicial process. The purpose of section 425.16 is to protect the valid exercise of constitutional rights of free speech and petition from the abuse of the judicial process (§ 425.16, subd. (a)), by allowing a defendant to bring a motion to strike any action that arises from any activity by the defendant in furtherance of those rights. (§ 425.16, subd. (b)(1).) By necessary implication, the statute does not protect activity that, because it is illegal, is not in furtherance of constitutionally protected speech or petition rights. (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at p. 819 ["If the defendant's act is not constitutionally protected how can doing the act be 'in furtherance' of the defendant's constitutional rights?"].) Thus, the rationale for applying the litigation privilege to some forms of illegal conduct—like perjury—because the occasional bad result is justified by the larger goal of access to the judicial process is simply not transferable to the anti-SLAPP statute because the latter statute does not promote the same goals as the former. Moreover, by its very terms, section 425.16 does not apply to activity that is not in furtherance of the constitutional rights of free speech or petition and this would necessarily include illegal activity that falls outside protected speech and petition rights. (See *Wilcox,* at p. 820 [the anti-SLAPP statute would not apply to a defendant's act of burning down a developer's office as a political protest].)

Conversely, Civil Code section 47 states a statutory privilege, not a constitutional protection. As we recognized in *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157 [232

Cal.Rptr. 567, 728 P.2d 1202], that statutory privilege is specific and limited in nature. In *Oren*, we concluded that while Civil Code section 47 prohibited an action based on a party's statements made during settlement negotiations, it did not preclude the use of those statements as evidence of the party's intent to establish an abuse of process claim. (*Oren, supra,* 42 Cal.3d at pp. 1167–1168.) We stated: " 'The privileges of Civil Code section 47, *unlike evidentiary privileges which function by the exclusion of evidence* [citation], operate as limitations upon liability.' (Italics added.) Indeed, on brief reflection, it is quite clear that section [47, subdivision (b)] has never been thought to bar the *evidentiary* use of every 'statement or publication' made in the course of a judicial proceeding . . . ." (*Oren*, at p. 1168.)

 By parity of reasoning, Civil Code section 47 does not operate as a limitation on the scope of the anti-SLAPP statute. The fact that Civil Code section 47 may limit the liability of a party that sends to an opposing party a letter proposing settlement of proposed litigation does not mean that the settlement letter is also a protected communication for purposes of section 425.16.[12] Therefore, we reject Mauro's contention that, because some forms of illegal litigation-related activity may be privileged under the litigation privilege, that activity is necessarily protected under the anti-SLAPP statute.

B. *Mauro's Assertedly Protected Conduct Was Criminal Extortion as a Matter of Law and Was Undeserving of the Protection of the Anti-SLAPP Statute.*

1. *Standard of Review*

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. (*Sylmar Air Conditioning v. Pueblo Contracting Services,*

---

[12] Mauro cites *Blanchard v. DIRECTV* (2004) 123 Cal.App.4th 903 [20 Cal.Rptr.3d 385], to establish that the anti-SLAPP statute applies to prelitigation demand letters that are extortionate because such letters are protected by the litigation privilege. In *Blanchard* the plaintiffs received letters from DIRECTV, a satellite television programming provider, explaining that use of illegal equipment purchased by the plaintiffs that unscrambled DIRECTV's signal violated federal law and offering an opportunity to resolve the matter before commencement of suit. (*Id.* at pp. 909–910.) Thereafter, the plaintiffs sued DIRECTV alleging that the mailing of the demand letters constituted an unfair business practice (Bus. & Prof. Code, § 17000), violated their civil rights, and constituted extortion. DIRECTV filed a motion to strike the lawsuit as a SLAPP and prevailed. As relevant here, DIRECTV argued, and the Court of Appeal agreed, that the demand letters were privileged under the litigation privilege as prelitigation communication and, therefore, the plaintiffs could not establish a probability of prevailing under the second prong of the anti-SLAPP statute. (*Blanchard, supra,* 123 Cal.App.4th at pp. 918–922.) Thus, *Blanchard* did not involve the question of whether the demand letter was extortion as a matter of law and thus unprotected by the First Amendment so as to bar DIRECTV from using the anti-SLAPP statute to strike the plaintiffs' action. Rather, the plaintiffs conceded that their lawsuit arose from DIRECTV's protected petitioning activity. (*Id.* at p. 918.) Accordingly, *Blanchard* is irrelevant to the issues presented here.

*Inc.* (2004) 122 Cal.App.4th 1049, 1056 [18 Cal.Rptr.3d 882].) We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' (*HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 [12 Cal.Rptr.3d 786].)" (*Soukup v. Hafif, supra,* 39 Cal.4th at p. 269, fn. 3.)

## 2. *Extortion*

"Extortion is the obtaining of property from another, with his consent . . . induced by a wrongful use of force or fear . . . ." (Pen. Code, § 518.) Fear, for purposes of extortion "may be induced by a threat, either: [¶] . . . [¶] 2. To accuse the individual threatened . . . of any crime; or, [¶] 3. To expose, or impute to him . . . any deformity, disgrace or crime[.]" (Pen. Code, § 519.) "Every person who, with intent to extort any money or other property from another, sends or delivers to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section 519, is punishable in the same manner as if such money or property were actually obtained by means of such threat." (Pen. Code, § 523.)

Extortion has been characterized as a paradoxical crime in that it criminalizes the making of threats that, in and of themselves, may not be illegal. "[I]n many blackmail cases the threat is to do something in itself perfectly legal, but that threat nevertheless becomes illegal when coupled with a demand for money." (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian* (1990) 218 Cal.App.3d 1058, 1079 [267 Cal.Rptr. 457].)[13] The extortion statutes "all adopted at the same time and relating to the same subject matter, clearly indicate that the legislature in denouncing the wrongful use of fear as a means of obtaining property from another had in mind threats to do the acts specified in section 519, the making of which for the purpose stated is declared to be a wrongful use of fear induced thereby." (*People v. Beggs* (1918) 178 Cal. 79, 83 [172 P. 152].) "It is the means employed [to obtain the property of another] which the law denounces, and though the purpose may be to collect a just indebtedness arising from and created by the criminal act for which the threat is to prosecute the wrongdoer, it is nevertheless within the statutory inhibition. The law does not contemplate the use of criminal process as a means of collecting a debt." (*Id.* at p. 84; see *People v. Tufunga* (1999) 21 Cal.4th 935, 955 [90 Cal.Rptr.2d 143, 987 P.2d

---

[13] In popular parlance extortion is "sometimes called 'blackmail.'" (*People v. Sales* (2004) 116 Cal.App.4th 741, 748 [10 Cal.Rptr.3d 527].)

168] [in *Beggs* "we explained that because of the strong public policy militating against self-help by force or fear, courts will not recognize a good faith defense to the satisfaction of a debt when accomplished by the use of force or fear"]; *Lindenbaum v. State Bar* (1945) 26 Cal.2d 565, 573 [160 P.2d 9] [for purposes of extortion "[i]t is immaterial that the money which petitioner sought to obtain through threats may have been justly due him"]; *Gomez v. Garcia* (9th Cir. 1996) 81 F.3d 95, 97 ["The law of California was established in 1918 that belief that the victim owes a debt is not a defense to the crime of extortion"].)

■ Moreover, threats to do the acts that constitute extortion under Penal Code section 519 are extortionate whether or not the victim committed the crime or indiscretion upon which the threat is based and whether or not the person making the threat could have reported the victim to the authorities or arrested the victim. (*People v. Sanders* (1922) 188 Cal. 744, 756 [207 P. 380]; *People v. Goldstein* (1948) 84 Cal.App.2d 581, 587 [191 P.2d 102]; *People v. Hesslink* (1985) 167 Cal.App.3d 781, 787 [213 Cal.Rptr. 465].) Furthermore, the crime with which the extortionist threatens his or her victim need not be a specific crime. "[T]he accusations need only be such as to put the intended victim of the extortion in fear of being accused of some crime. The more vague and general the terms of the accusation the better it would subserve the purpose of the accuser in magnifying the fears of his victim, and the better also it would serve to protect him in the event of the failure to accomplish his extortion and of a prosecution for his attempted crime." (*People v. Sanders, supra,* at pp. 749–750; see *People v. Massengale* (1968) 261 Cal.App.2d 758, 764–765 [68 Cal.Rptr. 415].)

■ Attorneys are not exempt from these principles in their professional conduct. Indeed, the Rules of Professional Conduct specifically prohibit attorneys from "threaten[ing] to present criminal, administration, or disciplinary charges to obtain an advantage in a civil dispute." (Rules of Prof. Conduct, rule 5-100(A).)[14]

■ In *Libarian v. State Bar* (1952) 38 Cal.2d 328 [239 P.2d 865], we upheld disciplinary action against Libarian who, after losing at trial, sent a letter to opposing counsel, accusing his opponent's client of perjury and threatening to use the perjury charge as the basis of a new trial motion and a criminal complaint unless opposing counsel's client paid Libarian's client. "Although no action was taken either by Libarian or Siegel to prosecute Nadel, the record clearly shows conduct which is in violation of Libarian's

---

[14] At all relevant times, Mauro was a member of the Illinois Bar. The comparable Illinois rule provides: "A lawyer shall not present, participate in presenting, or threaten to present criminal charges or professional disciplinary actions to gain an advantage in a civil matter." (Ill. Rules Prof. Conduct, rule 1.2(e).)

oath and duties as an attorney. The threats contained in the letter indicate an attempt to commit extortion. The sending of a threatening letter with intent to extort money is 'punishable in the same manner as if such money . . . were actually obtained' (Pen. Code, § 523) and the crime of extortion involves moral turpitude." (*Id.* at pp. 329–330; *Barton v. State Bar* (1935) 2 Cal.2d 294, 297 [40 P.2d 502] [the conduct of an attorney who threatened an oil company with reporting adulteration of its gasoline to the prosecutor unless it paid his clients was not only grounds for disbarment but "constituted an attempt to extort money as said crime is defined in sections 518, 519 and 524 of the Penal Code"]; *State v. Harrington* (1969) 128 Vt. 242 [260 A.2d 692, 699] [attorney's suggestion in letter demanding $175,000 settlement in divorce case that he might advise his client to report husband to Internal Revenue Service and United States Custom Service constituted "veiled threats [that] exceeded the limits of respondent's representation of his client in divorce action" and supported attorney's extortion conviction].) As these cases illustrate, a threat that constitutes criminal extortion is not cleansed of its illegality merely because it is laundered by transmission through the offices of an attorney. Bearing these principles in mind, we turn to the instant case.

### 3. *Application*

Extortion is not a constitutionally protected form of speech. (*R.A.V. v. City of St. Paul* (1992) 505 U.S. 377, 420 [120 L.Ed.2d 305, 112 S.Ct. 2538] (conc. opn. of Stevens, J.) ["Although the First Amendment broadly protects 'speech,' it does not protect the right to . . . 'extort' "]; *United States v. Quinn* (5th Cir. 1975) 514 F.2d 1250, 1268 ["It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all"].) The purpose of the anti-SLAPP statute, of course, is to protect "the valid exercise of the constitutional rights of speech and petition for the redress of grievances." (§ 425.16, subd. (a).) Flatley argues that the letter Mauro sent on behalf of Robertson, and his subsequent telephone calls to Flatley's attorneys, constituted extortion as a matter of law and, therefore, the trial court correctly dismissed Mauro's motion to strike Flatley's action as a SLAPP. (*Paul, supra,* 85 Cal.App.4th at pp. 1366–1367.) Mauro maintains that his activity on behalf of Robertson amounted to no more than the kind of permissible settlement negotiations that are attendant upon any legal dispute or, at minimum, that a question of fact exists regarding the legality of his conduct precluding a finding that it was illegal as a matter of law. We review the question de novo. (*Soukup v. Hafif, supra,* 39 Cal.4th at p. 269, fn. 3.)

Preliminarily, we note that, in the proceedings below, Mauro did not deny that he sent the letter nor did he contest the version of the telephone calls set forth in Brandon's and Field's declarations in opposition to the motion to

strike. We may therefore view this evidence as uncontroverted. (See *State v. Harrington, supra,* 260 A.2d at p. 699 ["The acts which he performed and the words that he wrote are established by direct and documentary evidence that is not contradicted."].)

At the core of Mauro's letter are threats to publicly accuse Flatley of rape and to report and publicly accuse him of other unspecified violations of various laws unless he "settled" by paying a sum of money to Robertson of which Mauro would receive 40 percent. In his followup phone calls, Mauro named the price of his and Robertson's silence as "seven figures" or, at minimum, $1 million. The key passage in Mauro's letter is at page 3 where Flatley is warned that, unless he settles, "an in-depth investigation" will be conducted into his personal assets to determine punitive damages and this information will then "**BECOME A MATTER OF PUBLIC RECORD, AS IT MUST BE FILED WITH THE COURT . . . . [¶] Any and all information, including Immigration, Social Security Issuances and Use, and IRS and various State Tax Levies and information will be exposed.** We are positive the media worldwide will enjoy what they find." This warning is repeated in the fifth paragraph: "[A]ll **pertinent information and documentation, if in violation of any U.S. Federal, Immigration, I.R.S., S.S. Admin., U.S. State, Local, Commonwealth U.K., or International Laws, shall immediately [be] turned over to any and all appropriate authorities.**" Finally, Flatley is warned that once the lawsuit is filed additional causes of action "shall arise" including "Defamatory comments, Civil Conspiracy, Reckless Supervision" which are "just the beginning" and that "ample evidence" exists "to prove each and every element for all these additional causes of action. Again, these actions allow for **Punitive Damages.**"

At the top of the final page of the letter is the caption: "**FIRST & FINAL TIME-LIMIT SETTLEMENT DEMAND**." Beneath it a paragraph warns that there shall be "**no continuances nor any delays.**" At the bottom of the page, beneath Mauro's signature, a final paragraph warns Flatley that, along with the filing of suit, press releases will be disseminated to numerous media sources and placed on the Internet.

In his first telephone conversation with Brandon, Mauro gave Flatley a deadline of the end of the month "to offer sufficient payment," apparently without any further discussion of the particulars of Robertson's claim. In his call to Brandon, one week after he sent the letter, Mauro complained that he had not yet heard from Flatley and told Brandon he would not extend the

deadline and "I know the tour dates; I am not kidding about this it will be publicized every place he [Mr. Flatley] goes for the rest of his life," and that dissemination of the story "would be immediate to any place where he and the troupes are performing everywhere in the world." The very next day, January 10, Mauro called Brandon again and, after leaving a message threatening to "go[] public" if Brandon did not return his call within a half-hour, Mauro "complained that people were investigating the matter before contacting him and were doing so in an intimidating manner. He said that, if he did not receive a call by 8:00 p.m. Central Standard Time that night from a representative of Mr. Flatley with authority, he would 'go public and the January 30 deadline is gone.' He said, 'I already have the news media lined up' and would 'hit him [Mr. Flatley] at every single place he tours.' "

Later that day, when Fields spoke to Mauro, Mauro told him "he knew how to play 'hardball' and that, if Mr. Flatley did not pay an acceptable amount, they would 'go public,' would see that their story would follow him wherever he or his groups performed and would 'ruin' him." In response to Fields's query about how much money Mauro wanted to avoid this, Mauro said "it would take 'seven figures.' " He repeated that the deadline to respond was January 30.

Evaluating Mauro's conduct, we conclude that the letter and subsequent phone calls constitute criminal extortion as a matter of law. These communications threatened to "accuse" Flatley of, or "impute to him," "crime[s]" and "disgrace" (Pen. Code, § 519, subds. 2, 3) unless Flatley paid Mauro a minimum of $1 million of which Mauro was to receive 40 percent. That the threats were half-couched in legalese does not disguise their essential character as extortion. (*Libarian v. State Bar, supra*, 38 Cal.2d at pp. 329–330; *State v. Harrington, supra*, 260 A.2d at p. 699.)

 Mauro's letter accuses Flatley of rape and also imputes to him other, unspecified violations of various criminal offenses involving immigration and tax law as well as violations of the Social Security Act. With respect to these latter threats, Mauro's letter goes on to threaten that "[w]e are positive the media worldwide will enjoy what they find." Thus, contrary to Mauro's claim that he did nothing more than suggest that, if evidence of other criminal conduct became public knowledge it would receive media attention, the letter implies that Mauro is already in possession of information regarding such criminal activity and is prepared to disclose this information to the "worldwide" media. Whether Flatley in fact committed any violations of these various laws is irrelevant. (*People v. Goldstein, supra,* 84 Cal.App.2d at p. 587 [for purposes of extortion, "[a] false accusation of crime is often as harmful as one that is true"].) Moreover, the threat to disclose criminal activity entirely unrelated to any alleged injury suffered by Mauro's client "exceeded

the limits of respondent's representation of his client" and is itself evidence of extortion. (*State v. Harrington, supra,* 260 A.2d at p. 699 [attorney's veiled threat to have his client in a divorce action inform on her husband to the Internal Revenue Service and Bureau of Immigration and Naturalization supports attorney's conviction of extortion].) That Mauro did not specify these other criminal offenses is of no import—"the accusations need only be such as to put the intended victim of the extortion in fear of being accused of some crime." (*People v. Sanders, supra,* 188 Cal. at p. 749.) Indeed, the very vagueness of the accusation serves the dual purpose of "magnifying the fear of his victim" and "protect[ing]" the extortionist "in the event of the failure to accomplish his extortion and . . . prosecution." (*People v. Massengale, supra,* 261 Cal.App.2d at p. 765.)

Mauro also threatened to accuse Flatley of raping Robertson unless he paid for her silence. Mauro argues that this threat cannot be the basis of a finding of extortion because Robertson had already reported the rape to the Las Vegas Police Department by the time the letter was sent. In the circumstances of this case, we reject his argument for the following reasons. We begin by examining the pleadings. (§ 425.16, subd. (b)(2).) Flatley's complaint alleged that the purpose of Robertson's telephone call to the Las Vegas Police Department was not to file an actual crime report but simply to "create a 'sham' record of a police report that would make her threats more ominous. . . . [S]he wanted to prevent the police from taking any action that might make the matter public, since any public report of police action would necessarily spoil Robertson's scheme to extort a payment from [Flatley] to avoid such publicity."[15]

These allegations are supported by the declarations of Mauro and Trautmann that they were never contacted by the police in connection with the alleged rape before Mauro sent his letter to Flatley's lawyers, and the absence of any evidence that the police ever took any action on the complaint. Moreover, Robertson's letter to the Las Vegas Police Department and Mauro's statements to the media after he filed Robertson's lawsuit—that she did not return to Las Vegas to pursue her complaint because she was too traumatized—support the conclusion that whatever complaint Robertson made to the Las Vegas police was insufficient to trigger a police investigation. Mauro's declaration did not deny that he was aware that the Las Vegas police had not launched an investigation into Robertson's allegations when he sent the letter to Flatley. Yet, the letter was careful to include the number of a police report made to the Las Vegas Police Department as if to hold a police investigation over Flatley's head. Thus, as Flatley alleges, the incomplete police report appears to have existed only to make the threat of disclosure

---

[15] We also observe that Mauro did not submit any declarations in support of his motion to strike that verified that a rape actually occurred.

more ominous and the need to "settle" with Robertson and Mauro all the more urgent. Under these circumstances, the fact that Robertson may have made some report to the police did not render her threat to publicly accuse Flatley of rape unless he paid her and Mauro any less extortionate. (*People v. Umana* (2006) 138 Cal.App.4th 625, 640 [41 Cal.Rptr.3d 573] ["Although section 519, subdivision 2, speaks in terms of *accusing* the victim of a crime, there is no reasonable basis for drawing a distinction between the initial accusation of a crime and continued pursuit of a criminal charge"].)

Moreover, in addition to the threats to accuse Flatley publicly of rape and violations of other laws, Mauro also alleged that he had in his possession "ample evidence" to support claims against Flatley for defamation and civil conspiracy and that these were "just the beginning." At minimum, these were threats that Flatley would be exposed to various kinds of opprobrium and he would be disgraced thereby unless he met Mauro's demands. (Pen. Code, § 519, subd. 3 [threat "to impute" "disgrace" sufficient to establish extortion].)

Lastly, any doubt as to extortionate character of the letter is dispelled by the accounts from Brandon and Fields of Mauro's telephone calls to them within a week of having sent the letter. In his very first conversation with Brandon, Mauro did not discuss the particulars of the claim or express an interest in negotiations but simply stated a deadline for Flatley "to offer sufficient payment." In a followup phone call, he objected to Flatley's investigation of Robertson's allegation and threatened to withdraw the January 30 deadline, thus further demonstrating that it was never his intention to engage in settlement negotiations. Instead, the insistent theme of his conversations with Flatley's lawyers is the immediate and extensive threat of exposure if Flatley failed to make a sufficient offer of money. This culminates in Mauro's threat to "go public" and "ruin" Flatley if the January 30 deadline was not met. We conclude that Mauro's conduct constituted criminal extortion as a matter of law in violation of Penal Code sections 518, 519 and 523.[16]

---

[16] We emphasize that our conclusion that Mauro's communications constituted criminal extortion as a matter of law are based on the specific and extreme circumstances of this case. Extortion is the threat to accuse the victim of a crime or "expose, or impute to him . . . any deformity, disgrace or crime" (Pen. Code, § 519) accompanied by a demand for payment to prevent the accusation, exposure, or imputation from being made. Thus, our opinion should not be read to imply that rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing, necessarily constitute extortion. (*Philippine Export & Foreign Loan Guarantee Corp. v. Chuidian, supra,* 218 Cal.App.3d at p. 1079 ["a person, generally speaking, has a perfect right to prosecute a lawsuit in good faith, or to provide information to newspapers"].) Nor is extortion committed by an employee who

Accordingly, because the activity forming the basis of Mauro's motion to strike Flatley's action was extortion as a matter of law and, therefore, not constitutionally protected activity for purposes of section 425.16, we further conclude that the trial court did not err when it denied Mauro's motion to strike.

## III. DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Corrigan, J., concurred.

**WERDEGAR, J.,** Concurring.—I agree with the majority that defendant does not enjoy the protection of the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16.)[1] I therefore concur in the judgment affirming the Court of Appeal. In moving to strike this action, it was defendant's initial burden to demonstrate the anti-SLAPP statute's applicability by showing the lawsuit arises from protected speech or petitioning. (*Id.*, subds. (b)(1), (e); *Zamos v. Stroud* (2004) 32 Cal.4th 958, 965 [12 Cal.Rptr.3d 54, 87 P.3d 802].) This he failed to do. Insofar as the gravamen of plaintiff's claim is that defendant attempted to extort money from him by threatening, through "various kinds of opprobrium" (maj. opn., *ante*, at p. 332), to ruin plaintiff's reputation and encourage prosecutorial authorities to pursue plaintiff (see especially *id.* at pp. 309–311, 329–332), the action does *not* arise from protected speech and petitioning.

The majority details plaintiff's evidentiary submissions opposing defendant's anti-SLAPP motion. (Maj. opn., *ante*, at pp. 306–311.) These describe what the operative second amended complaint alleges: a "vicious and criminal scheme" by defendant and others "to extort money from plaintiff by asserting demonstrably false claims of sexual misconduct by plaintiff and threatening to publicize those false claims throughout the world, so as to 'ruin' plaintiff, if he would not pay the money . . . demanded." Defendant, the complaint explicitly alleges, "participated in seeking to extort money from plaintiff by this malicious, oppressive, and criminal scheme" involving "threats to ruin him with widespread and continuing publication of . . . false claims of rape not only currently, but also whenever, in the future, he or his dance troupe would perform and . . . threats to bring about plaintiff's criminal

threatens to report the illegal conduct of his or her employer unless the employer desists from that conduct. In short, our discussion of what extortion as a matter of law is limited to the specific facts of this case.

[1] Unlabeled section references are to the Code of Civil Procedure.

prosecution" for rape. As the majority points out, defendant's scheme included threats "that if [plaintiff] did not pay an acceptable amount, he . . . would 'go public' " and "would ensure that the story would follow [plaintiff] . . . and would 'ruin' him." (Maj. opn., *ante*, at p. 311.) That plaintiff alleges the extortion scheme also included threats to sue (*id.* at pp. 307–309) does not necessarily mean the action "arises from" defendant's litigation-related activities. (*Kajima Engineering & Construction, Inc. v. City of Los Angeles* (2002) 95 Cal.App.4th 921, 930–931 [116 Cal.Rptr.2d 187] [mere presence of allegations in city's cross-complaint that contractor extorted money, inter alia, by filing or threatening lawsuits did not render it a SLAPP].)

Moreover, for many of the reasons the majority cites in concluding defendant's conduct was illegal as a matter of law (maj. opn., *ante*, at pp. 325–332), plaintiff plainly has demonstrated a probability that he will prevail on the claim (§ 425.16, subd. (b)(1)), bearing in mind, as we repeatedly have noted, that in order to make that demonstration he need only "state[] and substantiate[] a legally sufficient claim." (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123 [81 Cal.Rptr.2d 471, 969 P.2d 564]; see also *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056 [39 Cal.Rptr.3d 516, 128 P.3d 713]; *Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 [123 Cal.Rptr.2d 19, 50 P.3d 733].) Accordingly, the trial court properly denied defendant's anti-SLAPP motion.

As the foregoing disposes of the matter before us, I decline to join the majority in creating a judicial exception to the first (i.e., "arising from") prong of the anti-SLAPP statute for actions based on conduct courts determine was "illegal as a matter of law." (See § 425.16, subd. (b)(1); maj. opn., *ante*, at pp. 311–325.) Although the Legislature has embraced the concept of "illegal as a matter of law" as a limit on motions to strike so-called SLAPPback actions for malicious prosecution and abuse of process (see § 425.18, subd. (h)), it has not done so with respect to other anti-SLAPP motions and I am doubtful that our doing so is necessary or appropriate.

We previously have observed that the anti-SLAPP statute "poses no obstacle to suits that possess minimal merit." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 93 [124 Cal.Rptr.2d 530, 52 P.3d 703].) Accordingly, we have rejected, as contrary to the legislative design (*id.* at p. 94), any suggestion that in order to invoke the special motion to strike, i.e., to satisfy the statute's first prong, a "defendant must first establish her actions are constitutionally protected under the First Amendment as a matter of law" (*id.* at p. 95). I realize the majority's new exception does not go that far. Nevertheless, in adding to the burdens of defendants who seek anti-SLAPP protection the requirement that they first resist, on the merits, a plaintiff's assertion that the

conduct they are being sued for was "illegal as a matter of law" (maj. opn., *ante*, at p. 320), the majority moves in that direction. Since by definition all conduct sued upon is alleged to be illegal, the majority's assurances that the "narrow circumstance" (maj. opn., *ante*, at p. 315; see also *id.* at p. 316) for plaintiffs' invoking an illegal-as-a-matter-of-law defense to an anti-SLAPP motion will occur only in "rare cases" (*id.* at p. 320) are not convincing.[2]

Although the majority is at pains to emphasize that the question which arises under its new first-prong exception, i.e., whether the defendant's underlying conduct was illegal as a matter of law, "is preliminary, and unrelated to the second prong question of whether the plaintiff has demonstrated a probability of prevailing" (maj. opn., *ante*, at p. 320), I suspect maintaining any such distinction in practice will prove difficult. The majority asserts "the showing required to establish conduct illegal as a matter of law—either through defendant's concession or by uncontroverted and conclusive evidence—is not the same showing as the plaintiff's second prong showing of probability of prevailing." (*Ibid.*) The standard the majority articulates for its new exception, however, is virtually indistinguishable from the standard we previously have articulated for satisfying the statute's second prong.[3] The similarity may well sow doctrinal confusion among courts previously given to understand that "any 'claimed illegitimacy of the defendant's acts is an issue which the plaintiff must raise *and* support in the context of the discharge of the plaintiff's [secondary] burden to provide a prima facie showing of the merits of the plaintiff's case.' " (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 94.)[4]

---

[2] Similarly, since many torts are crimes and vice versa, I am not confident that, in branding this tort defendant's conduct "criminal extortion as a matter of law" (maj. opn., *ante*, at p. 332, fn. 16), the majority has invoked a principle easily "limited to the specific facts of this case" (*id.* at p. 333).

[3] The majority, citing section 425.16, subdivision (b)(2), articulates this standard for deciding whether a plaintiff qualifies for its new first-prong exception: " 'We consider "the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based." . . . However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' " (Maj. opn., *ante*, at p. 326.) In *Wilson v. Parker, Covert & Chidester, supra*, 28 Cal.4th at page 821, we cited the same subdivision in articulating the standard for deciding the second-prong question of potential merit: "[T]he trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant . . . ; though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim."

[4] Nor is it clear what the consequences for the parties, going forward, are likely to be of our declaring at this early stage of the litigation that defendant's conduct constitutes extortion as a matter of law. (See maj. opn., *ante*, at p. 332.) The majority does not address the point.

As the majority points out, "[o]ur concern for effectuating the legislative intent as demonstrated by the plain language of the [anti-SLAPP] statute has led us to reject attempts to read into section 425.16 requirements not explicitly contained in that language." (Maj. opn., *ante*, at p. 312.) For the reasons stated, I believe the majority's departure from that course in the present case is unwise.[5]

---

[5] The majority relies principally on *Paul for Council v. Hanyecz* (2001) 85 Cal.App.4th 1356 [102 Cal.Rptr.2d 864], which we disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, footnote 5 [124 Cal.Rptr.2d 507, 52 P.3d 685]. But as the majority acknowledges, *Paul* involved " 'a factual context in which defendants . . . effectively conceded the illegal nature of their . . . activities for which they [were sued]. Thus, there was no dispute on that point and [the Court of Appeal there] concluded, as a matter of law, that such activities are *not* a valid exercise of constitutional rights as contemplated by section 425.16.' " (Maj. opn., *ante*, at p. 315, quoting *Paul*, at p. 1367.) Moreover, the court in *Paul* was careful to note that, "had there been a factual dispute as to the legality of defendants' actions, then [the court] could not *so easily* have disposed of defendants' motion." (*Paul*, at p. 1367.) Here, of course, there indeed exists a factual dispute as to the legality of defendant's actions. (See maj. opn., *ante*, at p. 306.)

January 2, 2003

Michael Flatley, Individually,
& As Officer of Unicorn Entertainment, Inc
Parasec, Inc.-Registered Agent
318 No. Carson St., Suite 208
Carson City, Nevada 89701

## VIA FAX: 888-886-7168

***This communication is governed by all applicable common law decisions of
the State of Illinois and Rule 408 of the U.S. Federal Rules of Evidence.
All information contained herein is for settlement purposes only.***

RE: **LAWSUIT AGAINST MICHAEL FLATLEY, INDIVIDUALLY,
AND UNICORN ENTERTAINMENT, INC., AND THE VENETION
RESORT-HOTEL-CASINO JOINT VENTURE GROUP**

Our Client: JANE DOE (Identity shall remain inadmissible,
But the Official Police Report detailing this
Incident is on file with **The Las Vegas Police
Department, under Report # 02-1114-1768**

Date of Rape/Sex Assault: **OCTOBER 19-20, 2002**

DEAR FLATLEY *et. al.:*

Please be advised that we represent a women with whom you engaged in forcible sexual assault on or about October 19-20, 2003. Please consider this our *first*, and *only*, attempt to amicably resolve this claim against all Defendants named in the Complaint at Law enclosed herein.

000086

## NOTICE OF CLAIM & ATTORNEY'S LIEN

Please consider this as Notice of our Attorneys' Liens. We hereby make a claim and lien in the amount of 40% of the Total Recovery of all funds obtained through trial or settlement, plus all costs of suit, expert fees, and attorney fees leveled against you.

We suggest you *immediately contact us.* If you have insurance covering **INTENTIONAL ACTS**, then you should immediately contact *all* of your primary, excess and umbrella insurance carriers. They will be able to handle this for you.

Tell them to contact me directly. Your *failure* to do so shall result in us immediately filing a lawsuit against you and seeking all judgment proceeds *directly from your personal assets*. It is therefore in **your best interests** to contact us within the timeframe allotted, or all demands to settle shall be withdrawn.

**You are granted until January 30, 2002, to resolve this matter.** The amounts claimed in the lawsuit are *naturally negotiable prior to suit.* However, any and all offers to compromise, settle and amicably resolve this case will be **automatically withdrawn** at the close of business at **6:00 p.m. on January 30, 2003, Central Standard Time, for the U.S.**

Please be further advised that we have retained several forensic expert witnesses who, in additional to our client's treating medical personnel, have already completed thorough investigations and shall be testifying on our behalf. We attached their Biographical Information Sheets, Curriculum Vitae's, and their opinions shall be disclosed in detail in the public filed court documents in this litigation.

You will note that I have worked at Lloyd's of London, and am familiar with International Law. These causes of action allow for PUNITIVE DAMAGES. Punitive Damages are non-dischargeable in bankruptcy, and are recognized under British Law. We can therefore execute and collect any award against **MICHAEL FLATLEY** *personally* in the U.S., or the U.K

Since Punitive Damages are to serve as a *deterrent against future* Reckless, Wilful & Wanton, and Intentional acts, **Economist Frank Maguire**, of Reed & Stratford of Milwaukee, Wisconsin, will testify as to the amount of punitive damages which the law recognizes to justify "sending a message" or what constitutes a "deterrent".

000087

Your research will find that within the last 2 years alone, a settlement of **$100,000,000.00 was awarded for Punitive Damages** in favor of family who suffered from Negligent, Reckless, Wilful & Wanton, and Intentional Torts. Mr. Maguire shall testify as to what amount will justify a pro-rata share of punishment, and a jury will then award this amount against MICHAEL FLATLEY individually, from his *own personal assets*.

To do so, an in-depth investigation into MICHAEL FLATLEY'S *personal* assets, business agreements, royalties, future engagements and financial compensation worldwide shall be undertaken. ALL OF THIS INFORMATION SHALL BECOME A MATTER OF PUBLIC RECORD, AS IT MUST BE FILED WITH THE COURT, as it will be part of the bases of several of our expert's testimony.

Any and all information, including Immigration, Social Security Issuances and Use, and IRS and various State Tax Levies and information will be exposed. We are positive the media worldwide will enjoy what they find.

Our Forensic Criminologist, **Dr. John Lombardi**, along with our expert Human Resource Consultant, **Dr. David K. Hirshey**, conclude that all Defendants failed to adequately provide requisite safeguards for our client, and that there existed reason to know, prior to this assault, of a propensity and likelihood of such criminal behavior. As such, each Defendant named in the attached Complaint at Law shall be sued for compensatory and punitive damages, along with any other agents, owners or representatives of same, which shall be discovered through the course of the litigation.

**Once again, please remember all pertinent information and documentation, if in violation of any U.S. Federal, Immigration, I.R.S, S.S. Admin., U.S. State, Local, Commonwealth U.K., or International Laws, shall immediately turned over to any and all appropriate authorities.**

Once suit is filed, we anticipate that other causes of action shall arise. Defamatory comments, Civil Conspiracy, Reckless Supervision are just the beginning, and we already have ample evidence to prove each and every element for all these additional causes of action. Again, these actions allow for **Punitive Damages**.

3

## FIRST & FINAL
## TIME-LIMIT SETTLEMENT DEMAND

We look forward to a prompt and timely response. **There shall be no continuances nor any delays.** If we do not hear from you, then we shall know you are not interested in amicably resolving this claim and we shall immediately file suit.

Kindly direct all future communications, corresponded and calls to my attention.

Sincerely,

**D. Dean Mauro, P.C.**
**A Professional Law Corporation**
DDM/sg
Enc.
Cc: MARC MARTIN; JANE DOE

***This communication is governed by all applicable common law decisions of the State of Illinois and Rule 408 of the U.S. Federal Rules of Evidence. All information contained herein is for settlement purposes only.***

**P.S.** **Note:** along with filing suit, there shall be **PRESS RELEASES DISSEMINATED TO, but not limited to, THE FOLLOWING MEDIA SOURCES:** Fox News Chicago, Fox News Indiana, Fox News Wisconsin, and the U.S. National Fox News Network; WGN National U.S. Television; All Local Las Vegas Television, radio stations and newspapers; The Chicago Tribune, The Chicago Southern Economist, The News Sun, The Beacon News, The Daily Herald, The New York Times, The Washington Post; ALL National U.S. Television Networks of NBC, ABC and CBS; as well as INTERNET POSTINGS WORLDWIDE, including the BRITISH BROADCASTING COMPANY, and the Germany National News Network Stations.