Filed 3/25/14  Lee v. City of Fresno CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DAE LEE et al.,<br><br>        Plaintiffs and Appellants,<br><br>                v.<br><br>CITY OF FRESNO et al.,<br><br>        Defendants and Respondents. | F066230<br><br>(Super. Ct. No. 12CECG00640)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  M. Bruce Smith, Judge.

Jay S. Bloom for Plaintiffs and Appellants.

Wanger Jones Helsley, John P. Kinsey, Marisa L. Balch and David E. Cameron for Defendants and Respondents.

-ooOoo-

Dae Lee and Sook Lee (plaintiffs) leased property from the City of Fresno (City) and ran a business on the property. A dispute arose between the City and plaintiffs about whether plaintiffs were in compliance with the lease. After the City served a notice to perform or quit, plaintiffs filed a complaint against the City and PBID Partners of Downtown Fresno (PBID) alleging constructive eviction and interference with contractual relations and economic advantage. The City and PBID (defendants) moved to strike each cause of action in the complaint under the anti-SLAPP law, Code of Civil Procedure section 425.16.[1] The trial court granted the motion and dismissed the complaint.

On appeal, plaintiffs contend that defendants' conduct was not covered by the anti-SLAPP statute and that plaintiffs made an adequate showing they would prevail at trial. We disagree and affirm the court's order.

## FACTS AND PROCEDURAL HISTORY

### Background[2]

The City owns real property at 802 Fulton Mall in Fresno (premises), described as a 60,000 square foot annex connected to the original Gottschalks department store building located at Fulton Mall and Kern Street. In 1969, the City agreed to a 50-year lease of the premises with lessee E. Gottschalk & Co., Inc. (Gottschalk). In 1976, Gottschalk assigned the lease to the Gottschalk Realty Company. In October 1990, with the consent of the City, the Gottschalk Realty Company assigned the lease to six

---

[1]    Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure. "'SLAPP'" is an acronym for "'strategic lawsuit against public participation.'" (*La Jolla Group II v. Bruce* (2012) 211 Cal.App.4th 461, 465, fn. 1 (*La Jolla Group*).)

[2]    The facts are based on the pleadings, documents subject to judicial notice, and the declarations and attached documentation filed in support of, and in opposition to, the anti-SLAPP motion.

2.

individuals, including plaintiffs.[3] Around the same time, plaintiffs purchased the original Gottschalks department store building at 860 Fulton Mall.

Plaintiffs used the original Gottschalks department store building and the connected annex to run an indoor discount mall. This involved renting out spaces to subtenants who operated individual businesses. Individual businesses in the discount mall included clothing retailers, jewelry repair, a wig shop, a restaurant, and party supply vendors, among other businesses.

### Landlord-tenant dispute

According to the City, in 2010 and 2011, inspections of the premises revealed various code violations. Correction notices were issued to the tenants, but they did not correct the identified violations. As a result, Assistant City Manager Bruce Rudd sent a letter to the tenants dated September 1, 2011. The letter read, in relevant part:

> "It has come to my attention that over the last year the properties located at 802 - 830 Fulton Mall have been inspected by the Fresno Fire Department as well as the City's Community Revitalization Division (formerly the Code Enforcement Division). During these inspections, a number of code violations were identified and correction notices issued. To this date, it does not appear that any effort has been made to correct the current or past violations noted by the City.
>
> "Compounding this matter further is the fact that [the] building located at 802 Fulton is currently leased by your company from the City of Fresno.… Upon the review of the lease, as well as other documents related to this matter, it appears that failure to comply with the requirements set forth in the lease, as well as other Fresno Municipal Code requirements, has been an ongoing issue as reflected in a letter from former City Manager Jeff Reid dated December 15, 1999 (Attachment A).

---

[3] The assignees were plaintiffs Song Ho Kim, Eun Min Kim, Nam Ho Paik, and Sung Sil Paik. We refer to the six assignees collectively as the "tenants."

3.

"In addition to various zoning, building, plumbing, electrical and fire code violations (Attachment B), there are a number of lease violations that require immediate attention. These issues include, but are not limited to[:]

"Section 8, Improvements and Alterations
- Alterations, such as the painting of murals and the construction of an office(s), have been made to the building without City's approval and without permits.

"Section 11, Maintenance of Leased Premises and Building
- In addition to a number of building code violations, the ceiling, interior and exterior walls, sidewalks, gutters, and other appurtenances have not been properly maintained and are in need of immediate repair.

"Section 17, Assignment and Subletting
- Operating a Multi-Tenant Market and video arcade as well as selling used items without the appropriate Conditional Use Permit[.]
- Subletting of the building without the prior approval of the City Manager.
- Current subletting of the building exceeds 40% of retail space and is inconsistent with a retail operation as contained in the lease.

"Therefore, in accordance with Section 21 … , this letter is to formally notify you of your failure to perform under the terms and conditions of the lease and that the City will initiate termination within the next 30 days unless efforts are taken immediately to cure the noted violations."

The letter included two attachments: (1) the 1999 letter from Reid[4] and (2) a list of current zoning ordinance issues and violations, public nuisance ordinance violations,

---

[4]     In this letter addressed to the tenants, Reid wrote that an October 1999 inspection revealed "some code violations" and "conditions inconsistent with the terms of the lease." The letter indicated there were building, construction and safety issues, fire maintenance safety issues, plumbing and mechanical maintenance and safety issues, and electrical maintenance safety issues. The City requested proposals and plans from the tenants. In his declaration, Dae Lee stated that the premises were cited for code violations on one occasion in December 1999, and the matter was resolved when the

fire code violations, and building, electrical, plumbing and mechanical code violations. The tenants did not cure all the identified code and lease violations within 30 days.[5]

On December 13, 2011, the City served a "NOTICE TO PERFORM COVENANT OF LEASE OR QUIT" (first notice). The first notice listed five violations of the covenants of the commercial lease for 802 Fulton Mall. These were violations of section 7—"USE OF LEASED PREMISES," section 8—"IMPROVEMENTS[,] ALTERATIONS," section 11—"MAINTENANCE OF LEASED PREMISES AND BUILDING," section 14—"WASTE[,] QUIET CONDUCT," and section 17—"ASSIGNMENT AND SUBLETTING." The first notice provided that if the listed breaches of covenants were not cured within 30 days, the premises were to be vacated and delivered to the City.

The first notice was addressed to "DALE LEE" and Jorge A. Capacete, the general manager of the discount mall, and was personally served on Capacete. At the time he received the first notice, Capacete observed City representatives serve the first notice on subtenants at 802 Fulton and 860 Fulton. Within a few minutes of the service of the first notice, representatives of PBID arrived and began contacting subtenants. Capacete heard PBID representatives tell subtenants that their subleases were void and the City was going to evict the master tenant, Dae Lee, for breach of lease. PBID representatives told subtenants they were going to have to move and PBID had readily available alternative premises where they could immediately relocate. Within a week, 90 percent of the subtenants had left. Vacating subtenants told Capacete "they were scared by the

_____

parties agreed that plaintiffs would repair several items and the City would not require the repair of other items.

[5] In his declaration, Dae Lee did not mention the September 1, 2011 letter, and therefore did not expressly deny that he received it. Instead, he stated that he received a letter from the fire department in 2010 "concerning problems at the building." In response, plaintiffs hired a sprinkler company, had exhaust problems addressed, and fixed other minor problems in-house. Dae Lee stated plaintiffs received no citations for code violations for 12 years.

5.

statements made to them by PBID's representatives, and they were leaving because they needed to do business without interruptions or problems."

PBID is a special benefit assessment district organized to raise funds within downtown Fresno. It does not own any business or property in downtown Fresno. On December 15, 2011, Kate Borders, acting on behalf of PBID, distributed a flyer to the subtenants of the premises.

The flyer read:

> **"PBID Partners of Downtown Fresno wants to help!**
>
> > **"Day--Monday, December 19, 2011**
> > **"Time--8-11am**
> > **"Where--PBID offices - across the 'street' at 845 Fulton Mall.**
>
> "In response to the recent eviction notice presented, we want to assist any interested retailers to find alternative storefronts in Downtown Fresno. Our goal is to help you relocate and hopefully not miss one day of sales.
>
> "Please stop by our office Monday morning, December 19th from 8am to 11am. We will assess your retail needs and help you to find another space on The Fulton Mall. We will have English and Spanish speaking representatives available.
>
> "Please come with an idea of your square footage needs, a description of what you sell, an estimate of your monthly sales, and the number of employees you currently employ.
>
> "No appointment is necessary, but you may have a short wait. If you would prefer to call ahead, the number is **490-9966**."

According to Borders, "[the] flyer was distributed to each vendor in response to the [first notice] served by the City of Fresno, and out of a desire to assist any interested retailers in finding alternative storefronts in downtown Fresno, California and for the financial health and condition of downtown Fresno." Borders also stated that at no time did PBID solicit any business from plaintiffs or the vendors (i.e., subtenants) located at the premises.

6.

Two subtenants reported that, on or about December 15, 2011, PBID representatives told them their subleases were void. A few days later, these subtenants went to the PBID office and were told that the whole discount mall was going to be shut down because the City had other plans for the area. These plans included a hotel in place of the annex and new uses for the old Gottschalks department store.

On January 30, 2012, the City served a second "NOTICE TO PERFORM COVENANT OF LEASE OR QUIT" (second notice), which was addressed to "DALE LEE," Capacete, named individual businesses located in the premises, and "ALL OTHER OCCUPANTS IN POSSESSION." The second notice listed four violations of covenants of the commercial lease for 802 Fulton Mall. These were the same sections of the lease identified in the first notice, except that section 17—"ASSIGNMENT AND SUBLETTING"—was omitted from the second notice.[6] Again, the notice provided 30 days to cure the violations or vacate the premises. On March 27, 2012, the City filed an unlawful detainer action against the tenants (including plaintiffs), named individual businesses, and Doe defendants.

*Current lawsuit*

On February 27, 2012, plaintiffs initiated the current case by filing a complaint against defendants in Fresno County Superior Court. Plaintiffs asserted four causes of action: (1) declaratory relief against the City seeking a judicial declaration that the City constructively evicted plaintiffs from the premises, (2) violation of civil rights (42 U.S.C.

---

**6** In his declaration, Dae Lee stated that the statement in the first notice that the subleases were unauthorized was "totally false and inserted into the thirty day notice for an improper purpose." He continued, "After being advised by plaintiff of the state of the record concerning the approval of sub-leases, the City served a second thirty day notice on January 24, 2012, after the expiration of the thirty day period stated in the first Notice." We note, however, that the first notice did not state that all subleases were unauthorized. Rather, it stated that lessees were in violation of various covenants of the lease, including section 17. The notice quoted the language from section 17 of the lease, but did not state that any particular subleases were unauthorized.

7.

§ 1983) against all defendants, (3) interference with contractual relations against PBID, and (4) interference with economic advantage against PBID.

Plaintiffs alleged that, when they took over the lease of the premises in 1990, the City knew they were going to operate a discount mall on the premises, subleasing spaces to individual subtenants who would operate separate businesses. The City knew that plaintiffs would receive income from rent paid by subtenants. On or about December13, 2011, the City served plaintiffs and their subtenants with the first notice, which stated plaintiffs were in breach of the lease by, among other things, entering into prohibited subleases. In addition, "during the time plaintiffs had the right to cure any asserted breaches of the Lease, various agents or employees of the defendant City of Fresno went to the premises and orally informed the individual sub-lessees [subtenants] that the plaintiffs' discount mall was going to be closed down by the City of Fresno, and that the individual sub-lessees should move their businesses to other premises. Defendant's agents or employees offered to re-locate the individual sub-lessees to premises they owned or operated." Plaintiffs alleged:

> "As a result of said service [of the first notice] and the statements made by defendant's agents or employees to the sub-lessees, the sub-lessees immediately stopped paying rent and have vacated said premises. Plaintiffs are now left with vacant premises having no sub-lessees. Defendant's acts have denied plaintiffs the beneficial use of said premises, leaving plaintiffs without any source of income from the property."

Plaintiffs further alleged that each and every defendant was the agent or employee of the remaining defendants.

Defendants removed the case to federal district court, and the parties later stipulated to dismissal of the second cause of action and remand of the case to Fresno County Superior Court.

8.

On July 3, 2012, defendants filed a motion to strike the first, third, and fourth causes of action (all remaining claims) pursuant to section 425.16, the anti-SLAPP statute, and a general demurrer to the complaint.

In support of the anti-SLAPP motion, defendants first argued that all the claims arose from activity protected under section 425.16. They noted that an unlawful detainer action is protected activity. Since the service of a notice to perform or quit and statements about the mall being closed down by the City were related to, and made in anticipation of, the City's unlawful detainer action, those actions were also protected under section 425.16.

Second, defendants argued that plaintiffs could not establish a probability of prevailing because all their claims were barred by the litigation privilege (Civ. Code, § 47, subd. (b)) and, moreover, plaintiffs could not prove all the elements required to establish any of their claims.

Plaintiffs responded that their claims were "based on the landlord's solicitation of plaintiffs' customers in breach of the landlord's covenant of quiet enjoyment," not the service of a 30-day notice to perform or quit. They posited a "landlord's solicitation of a tenant's customers" is not conduct taken in furtherance of litigation and is not protected activity. In addition, plaintiffs argued they established a reasonable probability of prevailing on their claims.

On October 2, 2012, the trial court granted the defendants' anti-SLAPP motion. The court agreed with defendants that all of plaintiffs' claims were based on (1) serving notices to perform or quit and (2) making statements about the City's litigation activity. The court determined that this conduct was made in connection with litigation and was protected under the anti-SLAPP statute. The court next found that plaintiffs did not demonstrate a probability of prevailing on any of their claims. After granting defendants' anti-SLAPP motion to strike, the court found defendants' general demurrer to be moot.

Plaintiffs filed a notice of appeal on November 14, 2012.

## *DISCUSSION*

### I.   *Overview of the anti-SLAPP statute*

The Legislature enacted the anti-SLAPP statute to provide a procedure "for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. [Citation.]  The Legislature authorized the filing of a special motion to strike such claims (§ 425.16, subds.(b)(1), (f)), and expressly provided that section 425.16 should 'be construed broadly.'  [Citations.]"  (*Club Members For An Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 315.)

Under the anti-SLAPP statute, any "cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue" is "subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)  Thus, in deciding an anti-SLAPP motion, a trial court engages in a two-step process.  "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity.  The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant]'s right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute.  (§ 425.16, subd. (b)(1).)"  (*Equilon Enterprises v. Consumer Cause, Inc*. (2002) 29 Cal.4th 53, 67 (*Equilon*).)  Second, "[i]f the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim."  (*Ibid*.)

### II.   *Standard of review*

"We review de novo the trial court's ruling on an anti-SLAPP motion."  (*La Jolla Group*, *supra*, 211 Cal.App.4th at p. 469.)  "'We consider "the pleadings, and supporting

and opposing affidavits … upon which the liability or defense is based." (§ 425.16, subd. (b)(2).) However, we neither "weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." [Citation.]' [Citation.]." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 326 (*Flatley*).)

### III. *First step: Defendants showed plaintiffs' claims arose from protected activity*

"Under the first step of the analysis under section 425.16, [defendants] must make a threshold showing that the challenged cause of action arose from protected activity within the meaning of the statute." (*La Jolla Group*, *supra*, 211 Cal.App.4th at p. 471.) "In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89 (*Navellier*).)

Protected activity under section 425.16 includes "any act … in furtherance of the person's right of petition …." (§ 425.16, subd. (b)(1).) This means litigation activity, including "communicative conduct such as the filing, funding, and prosecution of a civil action" is protected under section 425.16. (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1056.) In addition, statements made in preparation for, or in anticipation of, litigation are protected under section 425.16. (*Flatley*, *supra*, 39 Cal.4th at p. 322, fn. 11 [rejecting the plaintiff's argument that prelitigation communication is not protected activity under section 425.16]; *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1115 (*Eden Council*); *Rohde v. Wolf* (2007) 154 Cal.App.4th 28, 36-37 [attorney's voicemail messages left for the plaintiff when "the spectre of litigation loomed over all communications between the parties" were made in anticipation of litigation and protected under section 425.16].)

11.

Here, the common factual allegations underlying all of plaintiffs' causes of action are (1) the City served the first notice on plaintiffs and their subtenants on or about December 13, 2011, and (2) around the same time, defendants made statements to the subtenants that: the "discount mall was going to be closed down by the City," the subtenants "should move their businesses to other premises," and defendants would help "re-locate the individual sub-lessees to premises they owned or operated." These allegations were supported by declarations from Capacete and two subtenants. Immediately after service of the first notice, Capacete heard PBID representatives tell subtenants that their subleases with plaintiffs were void, the City was going to evict Dae Lee, and PBID had readily available premises where the subtenants could relocate. The two subtenants were told by PBID representatives that the discount mall was going to be shut down and the City had other plans for the area. A PBID representative confirmed that she gave plaintiffs' subtenants flyers about finding new retail space, which were handed out "[i]n response to the recent eviction notice presented."

### A. *Service of notice*

An unlawful detainer action falls within the scope of petitioning activity protected by the anti-SLAPP statute. (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1182 (*Wallace*).) As defendants point out, service of written notice of the tenants' failure to perform covenants of the lease is a necessary prerequisite to filing an unlawful detainer action. (§ 1161, subd. (3).) Written notice also must be served on any subtenants in actual occupation of the property. (*Ibid*.) In this case, all evidence indicates that service of the first notice on plaintiffs and their subtenants on December 13, 2011, was made in preparation for the subsequent unlawful detainer action. Consequently, service of the first notice qualified as protected activity under section 425.16. (See *Wallace*, *supra*, at p. 1183 [service of notice of eviction is protected activity under anti-SLAPP statute where it is a legal prerequisite to bringing unlawful detainer action]; *Birkner v. Lam* (2007) 156 Cal.App.4th 275, 283-285 [service of termination notice was communication

12.

preparatory or in anticipation of bringing legal action and was protected under section 425.16].)  Plaintiffs appear to concede this point, as they argue, "[Their] causes of actions are based on the landlord's interference with and solicitation of plaintiffs' sub-tenants in breach of the landlord's covenant of quiet enjoyment.  *The claims are not based on the service of a thirty day Notice*."  (Italics added.)

### B. Statements to subtenants

Plaintiffs alleged defendants made statements to the subtenants that the "discount mall was going to be closed down by the City" and that the subtenants "should move their businesses to other premises."  Defendants argue that these statements to subtenants "simply reiterate[d] the legal effect of a successful unlawful detainer action (*i.e.*, termination of the tenants' possession), and thus relate[d] directly to, and were made in anticipation of, the City's eventual unlawful detainer action."  In other words, these statements were prelitigation communication protected under section 425.16.

In support of their position, defendants rely on *Feldman v. 1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467 (*Feldman*).  In *Feldman*, the landlord filed an unlawful detainer action against a tenant and his subtenants.  The subtenants, the Feldmans, then filed a cross-complaint against the landlord and Andrew Hawkins alleging retaliatory eviction, breach of implied covenant of quiet enjoyment, and wrongful eviction, among other claims.  (*Id*. at pp. 1473, 1475.)  The Feldmans alleged they reached an agreement with the tenant to sublet his apartment and they believed they had been approved as subtenants by the landlord's attorney.  (*Id*. at pp. 1473-1474.)  The Feldmans moved into the apartment.  About a month later, Hawkins, "who identified himself as the 'trouble shooter' for the owner of the apartments," gave notice that they had not been approved and they were in possession of the apartment unlawfully.  (*Id*. at p. 1474.)  According to subtenant and cross-complainant Konrad Feldman, Hawkins subsequently made the following threatening statements to him:

13.

"'(A) That he has done hundreds of evictions, so he knows the landlord will win, and how many had we done?

"(B) That regardless of the outcome of the current case, my wife and I will never be able to rent another apartment in San Francisco;

"(C) That he understands the law and has discussed the case with his uncle, who is a federal judge;

"(D) That we will not be able to file suit against them because they will win; [and]

"(E) That we could not have read the Addendum [a document provided by the landlord's attorney regarding the subtenancy] properly.'" (*Feldman*, *supra*, 160 Cal.App.4th at pp. 1474-1475.)

The landlord and Hawkins filed an anti-SLAPP motion to strike the Feldmans' cross-complaint. The trial court found the claims arose from protected activity but determined that the Feldmans showed a probability of prevailing on all of their claims except the claim for retaliatory eviction. (*Feldman*, *supra*, 160 Cal.App.4th at pp. 1475-1476.) Both parties appealed. (*Id*. at p. 1477.)

Aside from a single negligence claim (which was based on the landlord's communications with the Feldmans made before they moved in), the Court of Appeal observed, "[I]t appears that the cross-complaint was based entirely upon the alleged threats by Hawkins, the service of the notice to quit, and the filing of the unlawful detainer action itself." (*Feldman*, *supra*, 160 Cal.App.4th at p. 1479.) The filing of the unlawful detainer and service of the notice to quit were protected activity under section 425.16. (*Id*. at pp. 1479-1480.) Further, the court concluded: "Hawkins's alleged 'threats' were similarly within the scope of the anti-SLAPP statute. Clearly these statements were communications in connection with an ongoing dispute and in anticipation of litigation." (*Id*. at p. 1481.)

We agree with defendants that *Feldman* is instructive. In the present case, there was an ongoing dispute between the City and the tenants regarding the tenants'

14.

obligations under the lease, as shown by Rudd's letter of September 1, 2011, and it was anticipated that the City would file an unlawful detainer action following service of written notice to perform or quit. Statements to the subtenants that the discount mall was going be closed down by the City, the subleases were void, and the subtenants should move out essentially communicated the speaker's opinion that the City would prevail in an unlawful detainer action. These statements are similar to Hawkins's statements in *Feldman* that the landlord would win and the Feldmans would not be able to file suit against the landlord. Since plaintiffs alleged that PBID was an agent or employee of the City, PBID representatives are analogous to Hawkins, who was the landlord's representative. (*Feldman*, *supra*, 160 Cal.App.4th at p. 1489.) Following the reasoning of *Feldman*, we conclude these statements—that the discount mall was going to be closed down by the City, the subleases were void, and the subtenants should move out—were all communications in connection with an ongoing dispute and in anticipation of litigation and, therefore, were protected activity under section 425.16.

Although the trial court relied on *Feldman* in its decision, plaintiffs did not address the case in their opening appeal brief. Their attempts to distinguish *Feldman* in their reply brief are not persuasive. They point out that *Feldman* did not involve claims of business interference and the landlord in *Feldman* did not interfere with its tenant's business (although it did interfere with the tenant's agreement with his subtenants). Plaintiffs then argue the *Feldman* holding does not apply to this case, but they do not explain why.[7] Next, plaintiffs concede that "[a] landlord is within its rights to serve a

---

[7] The fact that plaintiffs in this case alleged business tort claims while the Feldmans sued for retaliatory eviction (among other claims) is not a meaningful distinction. The focus of our analysis is defendants' alleged *conduct*, not the form of plaintiffs' causes of action. (See *Navellier*, *supra*, 29 Cal.4th at pp. 91-92 [rejecting argument that breach of contract and fraud claims are categorically not covered by the anti-SLAPP statute and observing "conduct alleged to constitute breach of contract may also come within constitutionally protected speech or petitioning"].)

notice to perform [or] quit, and to tell sub-tenants that they will lose an eviction case and have to vacate." They claim, however, that they "are not suing for anything having to do with litigation." This is not a reasonable characterization of their own complaint. Their complaint alleged, "As a result of said service [of the first notice] and the statements by defendant's agents or employees to the sub-lessees, the sub-lessees immediately stopped paying rent and have vacated said premises.… Defendant's acts have denied plaintiffs the beneficial use of said premises .…" Plaintiffs' claims clearly arose from the service of the first notice and statements made in connection with the potential unlawful detainer action.

### 1. Claims based on protected and unprotected activity

As we have noted, plaintiffs contend their claims are not based on the service of the first notice but are "based on the landlord's interference with and solicitation of plaintiffs' sub-tenants in breach of the landlord's covenant of quiet enjoyment." They assert: "[Defendants] convinced the sub-tenants to breach their leases. They solicited business. They assisted the sub-tenants in vacating the premises. A landlord can't solicit the tenant's customers, causing it to lose its sole source of income, and then continue to demand the payment of rent and other leasehold obligations." We have already concluded that statements to subtenants made in connection with the ongoing landlord-tenant dispute and potential consequences of an unlawful detainer action were protected under section 425.16. There was also evidence that PBID offered to help subtenants find new storefronts.[8] To the extent plaintiffs' argument is that the offer to help subtenants

---

**8**  Capacete heard PBID representatives tell subtenants that PBID had readily available alternative premises where they could immediately relocate. PBID distributed a flyer which stated, "In response to the recent eviction notice presented, we want to assist any interested retailers to find alternative storefronts in Downtown Fresno. Our goal is to help you relocate and hopefully not miss one day of sales." There is no evidence in the record that PBID actually helped subtenants relocate, however.

relocate was not protected activity because it was not made in connection with an ongoing dispute and in anticipation of litigation, we conclude this does not insulate plaintiffs' claims from the anti-SLAPP statute.

"Where a cause of action is based on both protected activity and unprotected activity, it is subject to section 425.16 ""'unless the protected conduct is "merely incidental" to the unprotected conduct.'"" [Citations.]" (*Wallace*, *supra*, 196 Cal.App.4th at p. 1187; *Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1287 (*Salma*) ["A mixed cause of action is subject to section 425.16 if at least one of the underlying acts is protected conduct, unless the allegations of protected conduct are merely incidental to the unprotected activity."].)

Here, all of plaintiffs' claims were premised on the allegation that defendants' conduct caused plaintiffs' subtenants to breach their subleases and move out, resulting in the denial to plaintiffs of "the beneficial use of [the] premises." According to Capacete, vacating subtenants told him they were "scared" by statements made by PBID representatives and they were leaving "because they needed to do business without interruptions or problems." This suggests the subtenants moved out of plaintiffs' discount mall because they were afraid they were going to be evicted, not simply because they were offered help in finding different retail space. In other words, the subtenants moved out because of defendants' protected activities of serving the notice to perform or quit and making statements related to the potential unlawful detainer action. Thus, even if we assume the offer to help subtenants relocate was not protected activity, we cannot say the protected activity was merely incidental to the unprotected activity. Rather, defendants' protected activities "represent the bulk of the allegations underlying [each] cause of action." (*Salma*, *supra*, 161 Cal.App.4th at p. 1288.) Accordingly, all of plaintiffs' claims are subject to the anti-SLAPP motion. (See, e.g., *Wallace*, *supra*, 196 Cal.App.4th at pp. 1184-1187 [retaliatory eviction claim was subject to anti-SLAPP motion where claim was based on protected activities of three-day notice to quit and

17.

ensuing unlawful detainer action and unprotected activities of neighbors' complaints to landlord and landlord's refusal to accept new subtenant].)

### 2. *Case law*

In support of their position that their claims are not based on defendants' protected litigation activity, plaintiffs cite *Department of Fair Employment & Housing v. 1105 Alta Loma Road Apartments, LLC* (2007) 154 Cal.App.4th 1273 (*Alta Loma*). In *Alta Loma*, a landlord decided to remove its apartment building from the rental market, and one of the tenants asserted that she was disabled and requested a year to find alternative housing pursuant to state and local law. The landlord requested confirmation of the tenant's disability, and the tenant, believing it was a violation of her right to privacy, did not provide detailed information about her disability. The landlord had the tenant removed through an unlawful detainer action. The Department of Fair Employment and Housing (DFEH) then brought suit against the landlord for disability discrimination, and the landlord filed an anti-SLAPP motion. (*Id*. at p. 1275.) The trial court denied the landlord's motion, finding the complaint did not arise out of the landlord's protected petitioning activity. The Court of Appeal affirmed. (*Id*. at p. 1276.)

The court reasoned:

> "We will assume [the landlord]'s acts of filing and serving notices of its intent to remove its residential units from the rental market, its investigation and communications made necessary by the rent control removal process, and its filing and prosecuting its unlawful detainer actions against [the tenant] constituted protected petitioning or free speech activity. 'But the mere fact an action was filed after protected activity took place does not mean it arose from that activity.' Instead, '"'the act underlying the plaintiff's cause' or 'the act which forms the basis for the plaintiff's cause of action' must *itself* have been an act in furtherance of the right of petition or free speech." [Citation.]'

> "In this case, the pleadings and the affidavits submitted by the parties establish the gravamen of DFEH's action against [the landlord] was one for disability discrimination, and was not an attack on any act [the landlord] committed during the rental property removal process or during

18.

the eviction process itself. [¶] … [¶] Contrary to [the landlord]'s argument, the communications and the actual eviction itself were not the acts attacked in DFEH's complaint. Instead, the allegations of wrongdoing in DFEH's complaint arose from [the landlord]'s alleged acts of failing to accommodate [the tenant]'s disability. The letters, e-mail and filing of unlawful detainer actions constituted DFEH's *evidence* of [the landlord]'s alleged disability discrimination." (*Alta Loma*, *supra*, 154 Cal.App.4th at pp. 1283-1285, fns. omitted.)

Here, in contrast, the alleged wrongdoing by defendants *was* the service of the first notice and the statements made by defendants. Plaintiffs did not allege defendants committed any wrongful acts preceding the service of the first notice such as failing to accommodate a disability. The present case is more like *Feldman*, *supra*, 160 Cal.App.4th at page 1483, in which the court distinguished *Alta Loma* because the Feldmans' claims were actually based on the protected activities of filing an unlawful detainer action, serving a three-day notice, and making statements in connection with the threatened unlawful detainer. The *Feldman* court explained, "These activities are not merely cited as *evidence* of wrongdoing or activities 'triggering' the filing of an action that arises out of some other independent activity. These *are* the challenged activities and the bases for all causes of action .…" (*Feldman*, *supra*, at p. 1483.) Likewise, in this case, plaintiffs' claims arose from protected activity and not "some other independent activity." (*Ibid*.; see also *Wallace*, *supra*, 196 Cal.App.4th at p. 1192 [distinguishing *Alta Loma* and other landlord-tenant cases where claims were not based on landlord's protected activities of serving notice and filing unlawful detainer].)

The other cases cited by plaintiffs are not helpful to their appeal. *Brenton v. Metabolife Internat., Inc.* (2004) 116 Cal.App.4th 679, 685-686 (*Brenton*) presented the issue "whether a claim for physical injury against a manufacturer allegedly caused by use of its product, asserting theories of liability sounding in tort, contract and strict liability, is within the ambit of the anti-SLAPP statute merely because the manufacturer also engaged in commercial speech to market that product." The Court of Appeal held the plaintiff's claims were not subject to the anti-SLAPP statute, concluding that protected

speech was not the basis of claims for personal injuries allegedly caused by a defective product. (*Id*. at pp. 686-687, citing *Martinez v. Metabolife Internat., Inc.* (2003) 113 Cal.App.4th 181, 188 (*Martinez*).) The court followed its earlier decision, *Martinez*, in which the court held that "when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute." (*Martinez*, *supra*, at p. 188.) Plaintiffs' case is nothing like *Brenton* and *Martinez*. We have concluded the protected activity alleged by plaintiffs was not merely incidental to their claims.

*Ericsson GE Mobile Communications, Inc. v. C.S.I. Telecommunications Engineers* (1996) 49 Cal.App.4th 1591 (*Ericsson*), disapproved of on another point in *Eden Council*, *supra*, 19 Cal.4th at page 1123, footnote 10, and disapproved of on another point in *Equilon*, *supra*, 29 Cal.4th at page 68, footnote 5, is not relevant to plaintiffs' appeal either. In *Ericsson*, the plaintiff, Ericsson, and another company, Motorola, submitted proposals to Orange County to supply a law enforcement public communications system. The county hired the defendant to validate analysis of the competing proposals. (*Ericsson*, *supra*, at pp. 1594-1595.) After the county awarded the contract to Motorola, Ericsson sued the defendant alleging intentional interference with economic advantage. Ericsson alleged that the defendant intentionally misrepresented the technical and financial merits of the competing proposals to persuade the county to award the contract to Motorola. (*Id*. at pp. 1595-1596.) After the trial court granted the defendant's anti-SLAPP motion, the Court of Appeal reversed, concluding that the complaint arose from the defendant's performance of contractual obligations and not acts in furtherance of the right of free speech. (*Id*. at p. 1594.) To the extent *Ericsson* held that breach of contract or fraud claims are not subject to anti-SLAPP motions if the defendant's acts relate to contractual obligations, the California Supreme Court later rejected the categorical exclusion of certain types of causes of action from the anti-

20.

SLAPP statute. (*Navellier*, *supra*, 29 Cal.4th at pp. 91-92.) At any rate, *Ericsson* considered the scope of free speech rights under section 425.16, not petitioning activity, and has no bearing on plaintiffs' case.

In sum, defendants met their burden of showing that all of plaintiffs' claims arose from defendants' protected activity.

## IV. *Second step: Plaintiffs did not demonstrate a probability of prevailing on their claims*

In the second step of the section 425.16 analysis, the court "determines whether the plaintiff[s] ha[ve] demonstrated a probability of prevailing on the claim." (*Equilon*, *supra*, 29 Cal.4th at p. 67.) " ' " '[T]he plaintiff[s] 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff[s] is credited.' [Citations.]" [Citation.]' [Citation.] 'Thus, plaintiffs' burden as to the second prong of the anti-SLAPP test is akin to that of a party opposing a motion for summary judgment.' [Citation.] If the plaintiff fails to carry that burden, the cause of action is 'subject to be stricken under the statute.' [Citation.]" (*Feldman*, *supra*, 160 Cal.App.4th at pp. 1477-1478.)

Plaintiffs assert that, even if defendants' conduct is covered by the anti-SLAPP statute, they have established a reasonable probability that they will prevail on their claims. Defendants contend that all of plaintiffs' claims are barred by the litigation privilege.

"The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a 'publication or broadcast' made as part of a 'judicial proceeding' is privileged. This privilege is absolute in nature, applying 'to *all* publications, irrespective of their maliciousness.' [Citation.]" (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1241 (*Action Apartment*).) " 'The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial

proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [has] some connection or logical relation to the action.' [Citation.]" (*Ibid.*)

"'The principal purpose of [the litigation privilege] is to afford litigants and witnesses [citation] the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions. [Citations.]' [Citation.]" (*Action Apartment*, *supra*, 41 Cal.4th at p. 1241.) To serve the purpose of "curtailing derivative lawsuits," our Supreme Court has "given the litigation privilege a broad interpretation," and it has been invoked to immunize defendants from tort liability based on intentional inducement of breach of contract and intentional interference with prospective economic advantage, among other claims. (*Id*. at pp. 1241-1242.)

The litigation privilege is not limited to statements made during trial and "'may extend to steps taken prior thereto.'" (*Action Apartment*, *supra*, 41 Cal.4th at p. 1241.) "A prelitigation communication is privileged only when it relates to litigation that is contemplated in good faith and under serious consideration." (*Id*. at p. 1251.)

In *Feldman*, *supra*, 160 Cal.App.4th at page 1488, the Court of Appeal held the litigation privilege applied to the service of the notice to quit because the evidence showed the landlord promptly filed an unlawful detainer action after serving the notice. "The notice to quit was clearly connected to and logically related to the unlawful detainer action." (*Ibid*.) Hawkins's statements to the subtenant were also covered by the litigation privilege. The court explained:

> "Hawkins was [the landlord]'s representative and his statements concerned the Feldmans' tenancy. Crediting the Feldmans' description of Hawkins's statements, he told them they were unapproved occupants, he threatened them with legal action if they did not agree to pay market rent, he asserted that the Feldmans could not win an eviction suit, and that whatever the result of the threatened eviction, the Feldmans would never be able to rent another apartment in San Francisco. Whether taken individually or as a whole, Hawkins's statements were clearly connected to

22.

and made in anticipation of the eviction action they threatened. Whether done maliciously or without reasonable grounds to believe that the Feldmans were unlawful occupants of the premises, the statements were privileged." (*Feldman*, *supra*, 160 Cal.App.4th at p. 1489.)

Similarly, in this case, the evidence shows the City followed up the first notice with a second notice and then filed an unlawful detainer action. Plaintiffs do not allege the City was not contemplating an unlawful detainer action at the time the first notice was served. Therefore, the litigation privilege applies to the service of the first notice to the plaintiffs and subtenants.[9] Further, statements to subtenants that the discount mall was going to be closed, their subleases were void, and they should move out "were clearly connected to and made in anticipation of the eviction action … threatened" by the City, and these statements are also covered by the litigation privilege. (*Feldman*, *supra*, 160 Cal.App.4th at p. 1489.)

It appears to us that all of defendants' conduct is covered by the litigation privilege. The harm alleged by plaintiffs was the denial of the "beneficial use of [the] premises" resulting from the subtenants stopping payment of rent and vacating the premises. As we have observed, plaintiffs' evidence shows the subtenants moved out because they were "scared" and needed to do business without interruption or problem, suggesting defendants' conduct of serving the first notice and making statements about the potential unlawful detainer action caused the subtenants to move out. The litigation privilege applies to this conduct. As a result, plaintiffs cannot demonstrate a probability of prevailing on any of their claims.

---

**9**      Plaintiffs' claim that the first notice contained the false statement that the subleases were unauthorized does not change the result. The litigation privilege applies even to false statements. (See *Feldman*, *supra*, 160 Cal.App.4th at p. 1489 [statements privileged even if made "maliciously or without reasonable grounds"]; *Flatley*, *supra*, 39 Cal.4th at p. 322 ["The litigation privilege has been applied in 'numerous cases' involving 'fraudulent communication or perjured testimony.'"].)

Plaintiffs argue the litigation privilege should not apply because "there is no reasonable or logical relationship between the institution of an unlawful detainer case and the solicitation of plaintiffs' sub-tenants." Defendants respond that there is no evidence that the City or PBID solicited plaintiffs' subtenants and the evidence shows PBID does not own any facilities to rent to the subtenants. We agree with defendants. Although the evidence shows that PBID offered subtenants help to relocate, it does not show that PBID actually helped subtenants relocate, and certainly does not show that PBID or the City asked the subtenants to move into their facilities.

### V.     Attorney fees

Defendants request an award for attorney fees incurred in responding to plaintiffs' appeal. Under section 425.16, a prevailing defendant is entitled to recover attorney fees and costs, which includes fees incurred on appeal. (*Evans v. Unkow* (1995) 38 Cal.App.4th 1490, 1499-1500.) Accordingly, defendants are awarded attorney fees on appeal, the amount to be determined by the trial court upon motion by defendants. (*City of Alhambra v. D'Ausilio* (2011) 193 Cal.App.4th 1301, 1310.)

### DISPOSITION

The order of the trial court is affirmed. Costs are awarded to defendants.

_____
Kane, Acting P.J.

WE CONCUR:

_____
Franson, J.

_____
LaPorte, J.[*]

---

[*]     Judge of the Kings Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.